Francisco VASQUEZ, Plaintiff–Appellant,

v.

COUNTY OF LOS ANGELES, erroneously sued as Los Angeles County Board of Supervisors, Defendant–Appellee.

No. 00–56803.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 2001.

Filed Sept. 30, 2002.

Susan D. Salisbury, Rosemead, CA, for the appellant.

Barry M. Wolf, Greines, Martin, Stein & Richland, LLP, Beverly Hills, CA, for the appellee.

Before FERGUSON, T.G. NELSON, and W. FLETCHER, Circuit Judges.

Opinion by Judge T.G. NELSON; Dissent by Judge FERGUSON

T.G. NELSON, Circuit Judge.

Francisco Vasquez, a deputy probation officer at a Los Angeles County youth detention center, brought this action against the County, alleging that the County violated Title VII of the Civil Rights Act by discriminating against him on the basis of his national origin, subjecting him to a hostile work environment, and retaliating against him for filing discrimination charges. The district court granted the County's summary judgment motion, and Vasquez appeals. We affirm the district court.

I.

Francisco Vasquez is a Deputy Probation Officer, Level I (DPO I), who works for the County of Los Angeles at its Dorothy Kirby Center (DKC). DKC is a detention facility for youth who have committed less serious crimes. The youth live at DKC in various cottages, and the DPOs are assigned to a particular cottage or to the field, where they rotate between cottages. Vasquez was assigned to "turquoise cottage" during the events that led to this lawsuit.

Kelly Berglund was employed at DKC as a DPO II, and was also assigned to turquoise cottage. A DPO II has more supervisory responsibilities and takes on more complex cases than a DPO I. Berglund and Vasquez experienced conflicts while working together. Vasquez claims that Berglund yelled at him and made negative comments about him in front of the youth. During one altercation in February 1998, Berglund made a comment to Vasquez that Vasquez was too domineering with the minors and had a "typical Hispanic macho attitude." Later that month, Vasquez filed a grievance against Berglund for that remark. The director of the facility, Karma Leeds, offered to transfer Vasquez out of turquoise cottage to alleviate the conflict, but Vasquez did not want to leave turquoise cottage so he withdrew his grievance.

The following month, Berglund sent a memo to Leeds describing incidents in

which she believed Vasquez had behaved inappropriately. This memo was in response to Leeds' request for information regarding the conduct and behavior of Vasquez. Then, in the fall of 1998, Berglund commented to Vasquez that he should take a job in the field because "Hispanics do good in the field."

The culmination of the conflict occurred on March 27, 1999. Berglund was acting director of DKC on that day because neither the director nor the assistant director were present. Vasquez called Berglund to request permission for his cottage to play football against garnet cottage. Vasquez contends that Berglund granted his request, providing the game was touch football. Berglund claims that there was a policy at DKC that no football of any kind was to be played, and she therefore refused his request to play football but said he could play soccer.

Approximately one half hour after the telephone call, Berglund and two DPO I's walked out to the recreation area. As they approached the area, Berglund noticed two youths sitting on the curb, one of whom stood up, threw a soccer ball toward the field, and yelled something in the direction of the field. When Berglund and the two DPOs arrived at the field, they saw the youth from turquoise cottage and garnet cottage kicking a soccer ball. Some had flags hanging from their waistbands. All play stopped when Berglund arrived at the field. Berglund asked several of the youth if they had been playing football, but they denied it. Vasquez then took the youth back to turquoise cottage. Vasquez later admitted that the youth were playing football, and that he saw the game end abruptly and two players throw down their flags as Berglund approached the field.

Berglund next called Mario Ng, the DPO I for garnet cottage. Ng admitted to playing football and stated that he was not aware that Berglund had spoken to Vasquez before the game. Berglund proceeded to turquoise cottage and again questioned the youth about the game. One youth denied playing football, but Vasquez told Berglund that the youth had been playing football. After Berglund left, Vasquez told the youth that they should write letters to Berglund, apologizing for lying to her and being disrespectful, which they subsequently did.

On the following Monday, Berglund sent Leeds a memo detailing her version of the events of March 27. The memo stated that Vasquez disobeyed Berglund's order to not play football. Leeds also read the letters from the youth in turquoise cottage admitting that they had lied to Berglund and that one had acted as a lookout during the football game. Leeds then talked to Vasquez's supervisor, Star French, and Mario Ng. Finally, Leeds spoke with Vasquez, who denied doing anything wrong. However, Leeds received the impression that Vasquez knew he should not have been playing football. On April 2, 1999, Leeds removed Vasquez from turquoise cottage and placed him in a field position. On April 5, 1999, Star French issued a letter of warning to Vasquez for failing to follow instructions from an acting residential supervisor. Vasquez chose not to respond to the letter.

On June 23, 1999, Vasquez filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging harassment and disparate treatment during the period of March 27, 1999, to April 5, 1999. Vasquez then went on disability leave until August 1999 because of stress and depression. Upon Vasquez's return, Leeds asked him if he planned to pursue his claim and threatened to transfer him out of DKC if he did pursue it. In addition, Vasquez was not assigned any overtime work and continued to be denied bilingual pay.

After the EEOC issued a right-to-sue letter on July 19, 1999, Vasquez filed a complaint against the County of Los Angeles under Title VII. He alleged causes of action for discrimination because of harassment and disparate treatment, and retaliation. The county moved for summary judgment, and the district court granted the motion. The court held that Vasquez could not establish a prima facie case for the disparate treatment claim because there was no adverse employment action and Vasquez failed to show that similarly situated employees were treated differently. It also held that the alleged harassment was not severe or pervasive enough to create a hostile work environment. Finally, the court dismissed the retaliation claim because Vasquez did not exhaust his administrative remedies and, in the alternative, did not establish a prima facie case because there was no adverse employment action related to the protected activity. Vasquez appeals each of those decisions. We have jurisdiction to hear this appeal pursuant to 42 U.S.C. § 2000e–5 and 28 U.S.C. § 1291.

## II.

We review a district court's grant of summary judgment de novo.[1] We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law.[2]

## III.

■ In order to prevail in a Title VII case, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.[3]

■ Vasquez's disparate treatment claim fails because he cannot establish his prima facie case. For a prima facie case, Vasquez must offer evidence that "give[s] rise to an inference of unlawful discrimination,"[4] either through the framework set forth in *McDonnell Douglas Corp. v. Green*[5] or with direct evidence of discriminatory intent.[6] In addition, he also must show that he suffered an adverse employment action.[7] We need not decide whether

1. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

2. *Id.*

3. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir.1997).

4. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, unlawful discrimination is presumed if the plaintiff can show that (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817).

6. *Cordova*, 124 F.3d at 1148 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

7. Although this court has not expressly stated that an adverse employment action is part of any prima facie case, including those cases based on direct evidence of discrimination rather than the *McDonnell Douglas* factors, such is clearly the case. The Supreme Court stated in *St. Mary's Honor Center v. Hicks* that "Title VII award[s] damages ... only against employers who are proven to have taken adverse employment action by reason of (in the

Vasquez offered sufficient direct or indirect evidence of discrimination because he failed to establish that he suffered an adverse employment action.

Vasquez's claim of disparate treatment arises from his transfer out of turquoise cottage into a field position and the letter of warning placed in his file. We agree with the district court that neither of these acts constitute an adverse employment action.

There is no dispute that a DPO I assigned to a cottage and a DPO I assigned to the field have the same pay, hours, amount of responsibility and authority, and essentially the same duties. The primary difference between the positions is that a field DPO has more administrative duties and less interaction with the youth. The official employment specifications for a DPO I do not distinguish between the two types of positions but list standards and duties applicable to both. Vasquez admitted that the transfer was not a demotion but simply a lateral move. He stated that the move was detrimental to him, however,

because he preferred to be assigned to a cottage, where he had more contact with the youth and less administrative work. The question is whether such a subjective preference is relevant when deciding if the employment action was adverse.

We have taken a broad view of adverse employment actions.[8] There are a wide array of disadvantageous changes in the workplace that constitute adverse actions, including some lateral transfers.[9] As noted in *Ray v. Henderson*,[10] we are in accord with the First, Seventh, Tenth, Eleventh, and D.C. Circuits, which also take an expansive view of adverse employment actions, in holding that an action can be adverse even if it is not an ultimate employment decision like termination or a material alteration in the terms and conditions of employment.[11] However, we have never considered whether a purely subjective detriment is sufficient to establish an adverse employment action. Because this court aligns itself with the aforementioned circuits, cases from those circuits discussing this issue are instructive.

context of the present case) race." 509 U.S. 502, 523–24, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Furthermore, we have previously indicated that an adverse action is a necessary part of a Title VII claim. *Wallis*, 26 F.3d at 889 (after recognizing that a prima facie case can be based on the *McDonnell Douglas* factors or on direct evidence of discriminatory intent, the court stated that "[o]nce a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the *adverse action* was taken for other than impermissibly discriminatory reasons.") (emphasis added); *Lowe v. City of Monrovia*, 775 F.2d 998, 1005, 1006–07 (9th Cir.1985) (stating that "in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the *adverse employment decision* is a pretext for another motive which is discriminatory," and then acknowledging that the prima facie case can be established through the *McDonnell Douglas* framework or direct evidence of discriminatory intent) (emphasis added) *amended by*

784 F.2d 1407 (9th Cir.1986); *see also Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir.1999) ("To establish a prima facie case for discrimination, [plaintiff] had to present evidence showing that she suffered an adverse employment action and some evidence of discriminatory motive behind that action.").

**8.** *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000).

**9.** *Id.* at 1241, 1243–44; *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (holding that transfers of job duties would constitute adverse employment action); *St. John v. Employment Dev. Dep't*, 642 F.2d 273, 274 (9th Cir.1981) (holding that transfer to another job of same pay and status may be adverse action).

**10.** 217 F.3d 1234.

**11.** *Id.* at 1241.

■ The Seventh, Tenth, Eleventh, and D.C. Circuits have all stated that an adverse employment action is to be viewed objectively. The Seventh Circuit declared that "[t]he adversity of an employment action is judged objectively"[12] and "not everything that makes an employee unhappy is an actionable adverse action."[13] The Tenth Circuit noted that "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action."[14] The D.C. Circuit has also required objectively tangible harm rather than "[m]ere idiosyncracies of personal preference" to show an adverse employment decision.[15]

The Eleventh Circuit considered this issue the most comprehensively of all the circuits and came to the same conclusion.[16] That circuit adopted the approach that the plaintiff must "demonstrate that a reasonable person in his position would view the employment action in question as adverse."[17] The *Doe* court noted that it had found no case in its circuit or any other circuit in which a court explicitly relied on the subjective preference of a plaintiff to hold that the plaintiff had suffered an adverse employment action.[18]

■ We agree that the proper inquiry is to view the action objectively to determine whether it was adverse. Otherwise, every minor employment action that an employee did not like could become the basis of a discrimination suit. The better approach is to determine whether a reasonable person in the same situation would view the action as disadvantageous. We therefore follow the Seventh, Tenth, Eleventh, and D.C. Circuits in holding that a purely subjective analysis is not appropriate when deciding whether an employment action was adverse.

In light of this decision, we hold that Vasquez's transfer from turquoise cottage to the field was not an adverse employment action. He suffered no decrease in pay and no change in hours, work location, authority, or responsibility. His preference to work in a cottage was purely subjective, as evidenced by the fact that other DPO I's had requested transfers from cottage assignments to the field. Because Vasquez offers no evidence that the field assignments were objectively less desirable or disadvantageous, he cannot establish that he suffered an adverse employment action when Leeds transferred him.[19]

■ The other action at issue is the warning letter. At DKC, a letter of warning is not a reprimand, suspension, or demotion, but is used to inform the employee

---

**12.** *Cullom v. Brown,* 209 F.3d 1035, 1041 (7th Cir.2000).

**13.** *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996).

**14.** *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 n. 6 (10th Cir.1998).

**15.** *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999)

**16.** *See Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1449 (11th Cir.1998).

**17.** *Id.*

**18.** *Id.* at 1448.

**19.** Vasquez asserts that when Leeds told him of his transfer, she stated that it was because he had poor judgment. According to Vasquez, this statement, combined with the actual transfer, was the adverse employment action. We do not believe that Leeds' statement affects our analysis. Leeds' statement to Vasquez about the reason for the action does not change the fact that the action itself, the transfer, was not adverse or disadvantageous when considered objectively.

that he did something wrong. The letter remains in the employee's file for one year. Vasquez's supervisor, Star French, testified that a warning letter should not affect a person's chance to be promoted and that such a letter would not affect her judgment as to whether someone she supervised should be promoted. This letter of warning was not an adverse employment action.

■ We have previously held that dissemination of an unfavorable job reference was an adverse employment action even though it did not affect the potential employer's decision.[20] We have also held that undeserved negative performance ratings are adverse actions.[21] However, we held in *Kortan v. California Youth Authority*[22] that a negative evaluation was not an adverse action when it was not disseminated beyond the second-level supervisor and was corrected so as to not be undeserved.[23]

The letter in this case was not an adverse action. It was not disseminated beyond French and Leeds, Vasquez's supervisors, and was to be removed from his file after one year. The purpose of the letter was not to act as an evaluation or performance review, but to let Vasquez know he had done something wrong. In that regard, the letter was not undeserved because French was concerned that Vasquez was not taking the situation seriously and she wanted to make sure Vasquez knew that not following an order of an acting supervisor was wrong. The letter had no detrimental effect on Vasquez at the time it was issued. It also was unlikely to have any future effect because it was not dis-

seminated and would not have influenced French's decision concerning any potential promotion. Therefore, it was not an adverse employment action. Because Vasquez cannot establish that he suffered any adverse employment action, the district court was correct to dismiss his disparate treatment claim.

## IV.

■ Vasquez next asserts that Berglund's conduct towards him was racially based harassment that created a hostile work environment.[24] Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of his race, color, religion, sex, or national origin.[25] To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.[26] Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to our analysis.

■ To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether

---

20. *Hashimoto v. Dalton,* 118 F.3d 671, 676 (9th Cir.1997).

21. *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987).

22. 217 F.3d 1104 (9th Cir.2000)

23. *Id.* at 1113.

24. Vasquez claimed discrimination based on national origin. However, a claim that he was discriminated against because he was Hispanic is actually a race based claim.

25. 42 U.S.C. § 2000e–2(a)(1).

26. *Gregory v. Widnall,* 153 F.3d 1071, 1074 (9th Cir.1998).

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[27] In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive."[28] Berglund's conduct was not severe or pervasive enough to constitute a hostile work environment and thus did not violate Title VII.

Vasquez claims that Berglund continually harassed him but provides specific factual allegations regarding only a few incidents. The primary basis of Vasquez's claim arises from statements by Berglund that Vasquez had "a typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field." These statements were made more than six months apart. Concerning Vasquez's allegation that Berglund yelled at him in front of the youth, Vasquez provides evidence of only two instances when this occurred. One instance was when Berglund yelled at Vasquez for letting the youth "sniff paint" while Vasquez was painting a doorway in the cottage. The other instance occurred when Berglund called Vasquez a juvenile delinquent for letting the youth play football. Vasquez's allegation that Berglund made negative remarks about him in front of the youth is based on reports from the youth. Vasquez did not have personal knowledge of those remarks. Finally, regarding the allegation that Berglund made continual, false complaints about Vasquez to Leeds, Vasquez offers two memos written by Berglund, one in response to Leeds'

request for information about Vasquez's performance, and one written a year later concerning the events of March 27. All of these incidents occurred over the course of more than one year.

When compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII. In *Sanchez v. City of Santa Ana*,[29] the court dismissed plaintiff's hostile work environment claim. We held that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino.[30] The allegations in *Sanchez* were at least as severe as those in this case, yet the court held as a matter of law that there was no hostile work environment.

Sexual harassment cases also provide examples of the type of conduct necessary to produce an abusive work environment. We held in *Draper v. Coeur Rochester, Inc.*,[31] that defendant created a hostile work environment where the plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes.[32] Likewise, we

---

**27.** *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (internal quotation marks and citation omitted), *reh'g denied*, 533 U.S. 912, 121 S.Ct. 2264, 150 L.Ed.2d 248 (2001).

**28.** *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir.2000) (internal quotation marks and citation omitted).

**29.** 936 F.2d 1027 (9th Cir.1990).

**30.** *Id.* at 1031, 1036.

**31.** 147 F.3d 1104 (9th Cir.1998).

**32.** *Id.* at 1109.

came to the same conclusion in *Nichols v. Azteca Restaurant Enterprises, Inc.*[33] There, a male employee of the restaurant was subjected to a relentless campaign of insults, name-calling, vulgarities, and taunts of "faggot" and "fucking female whore" by male co-workers and supervisors at least once a week and often several times a day.[34]

In contrast, we determined in *Kortan* that there was no hostile work environment when a supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence; the supervisor called the plaintiff "Medea"; the plaintiff complained about other difficulties with that supervisor; and the plaintiff received letters at home from the supervisor.[35] The court held that, while the supervisor's language was offensive, his conduct was not severe or pervasive enough to unreasonably interfere with the plaintiff's employment.[36]

When considered in light of these previous cases, the conduct complained about by Vasquez did not create an abusive work environment. The allegedly harassing incidents, which occurred over the course of more than one year and only two of which contained racially related epithets, did not create a hostile work environment for Vasquez. The conduct was less frequent, less severe, and less humiliating than the conduct at issue in *Draper* or *Azteca* but, rather, was more in line with that in *Kortan.* Two isolated offensive remarks, combined with Vasquez's other complaints about unfair treatment, are similar to the incidents in *Kortan* where the supervisor made several offensive sexual remarks and the plaintiff had other difficulties with that supervisor. Like in *Kortan*, we conclude that Berglund's conduct was not severe or pervasive enough to create a hostile work environment.

## V.

Vasquez's last claim is that Leeds, Berglund, and other county employees retaliated against him for filing a grievance against Berglund and for filing a discrimination charge.[37] To establish subject matter jurisdiction over his Title VII retaliation claim, Vasquez must have exhausted his administrative remedies by filing a timely charge with the EEOC.[38] This affords the agency an opportunity to investigate the charge.[39] Subject matter jurisdiction extends to all claims of discrimination that fall within the scope of the EEOC's actual investigation or an EEOC investigation that could reasonably be expected to grow out of the charge.[40]

Because Vasquez's EEOC charge only claimed harassment and different treatment, we must decide whether his current retaliation claim is reasonably related to the EEOC charge. In doing so, we may consider "such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the

---

33. 256 F.3d 864 (9th Cir.2001).

34. *Id.* at 870.

35. *Kortan,* 217 F.3d at 1107.

36. *Id.* at 1111.

37. The district court only considered Vasquez's allegation that the County retaliated against him for filing a discrimination charge with the EEOC. However, it appears that Vasquez did include in his claim the allegation that the County also retaliated against him for filing the original grievance against Berglund. Therefore, we will consider both parts of his claim.

38. 42 U.S.C. § 2000e–5(b); *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1099 (9th Cir. 2002).

39. *B.K.B.,* 276 F.3d at 1099.

40. *Id.* at 1100 (internal quotation marks and citation omitted).

charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred."[41] We conclude that Vasquez did not exhaust his administrative remedies regarding retaliation for filing the discrimination charge but that he did exhaust as to retaliation for filing the grievance.

■ Vasquez's EEOC complaint alleged that he was subject to harassment and different treatment on March 27, 1999, because Berglund accused him of lying. The charge then states that Vasquez was transferred out of turquoise cottage on April 2, 1999, and given a letter of warning on April 5, 1999. The charge also states that Berglund did not give Vasquez a reason for subjecting him to harassment and different treatment, but that Leeds told him he was transferred for failing to follow instructions and violating an established practice. The only names mentioned in the complaint were Berglund and Leeds. Vasquez checked the box on the form for discrimination based on national origin but did not check the box for retaliation.

The first part of Vasquez's retaliation claim concerns retaliation against him for filing the discrimination charge with the EEOC. Vasquez filed the charge on June 23, 1999. Vasquez asserts that after he returned to work in August 1999, Leeds threatened that she could have him transferred out of DKC if he pursued his discrimination claim. Vasquez also asserts retaliation for filing his EEOC charge because he was not assigned overtime duty and he did not receive bilingual pay. None of these acts fall under an investigation that the EEOC would have conducted based on the charge.

The only person that Vasquez accused of discriminatory acts in his EEOC charge

was Berglund. However, Berglund was not responsible for assigning overtime work or for awarding bilingual pay. Based on Vasquez's charge, the EEOC would have no reason to investigate the employees who assigned overtime work or the employees who decided whether to award bilingual pay. In addition, the denials of overtime work and bilingual pay are completely unrelated to the facts that form the basis of the discrimination in the charge. Finally, the denial of overtime work and bilingual pay did not occur within the time frame of the events alleged in the EEOC charge. A reasonable investigation by the EEOC would not have encompassed these allegedly retaliatory acts.

As for Leeds' threat to transfer Vasquez, that event occurred several months after the alleged harassment and even after the EEOC had issued its right-to-sue letter. The EEOC could not have investigated that incident because it had not yet happened at the time the EEOC was conducting its investigation. And while Leeds' threat of transfer is similar to her transfer of Vasquez out of turquoise cottage, Leeds was not the individual accused of harassment. The EEOC would have reasonably investigated conduct of Berglund but not conduct of Leeds. Because Vasquez did not present the legal theory of unlawful retaliation, and the operative facts regarding this part of his claim were not related to the facts in the EEOC charge, he did not exhaust his administrative remedies.[42] Thus, we have no jurisdiction to hear the claim that the County retaliated against Vasquez for filing an EEOC charge.

■ The second part of Vasquez's retaliation claim is based on acts that oc-

---

41. *Id.*

42. *Ong v. Cleland,* 642 F.2d 316, 319 (9th Cir.1981) (stating that an EEOC charge must notify the agency of the legal theory being argued and the operative facts at issue).

curred after he filed the February 1998 grievance against Berglund for discrimination. Vasquez claims that his transfer out of turquoise cottage and Berglund's harassment were in retaliation for the grievance he filed. Again we must determine whether Vasquez exhausted his administrative remedies as to this part of his claim. While the EEOC charge does not contain the relevant legal theory of retaliation, it does contain the relevant factual allegations. The EEOC charge alleges that Berglund harassed Vasquez and that he was transferred out of turquoise cottage, the same acts specified as retaliation in his claim. Because an investigation of the EEOC charge would likely have revealed Vasquez's earlier grievance against Berglund, a claim of retaliation could have "grow[n] out of the charge."[43] We conclude that Vasquez did exhaust his administrative remedies as to this part of his claim. Thus, we have jurisdiction to consider his retaliation claim regarding the grievance.

 To make out a prima facie case of retaliation, Vasquez must establish that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events.[44] This analysis requires us to examine separately whether the "adverse employment action" is considered through an objective or subjective lens. We addressed this question, at least in passing, in *Ray v. Henderson*.[45] We adopted the EEOC standard from its compliance manual,[46] and held that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."[47] In context, this is, at least in part, a subjective standard since the EEOC manual speaks of " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter *the charging party* or others from engaging in protected activity.' "[48]

Including behavior of the charging party in the standard removes it from the hypothetical "reasonable employee" approach and makes it more subjective. Of course, it is not entirely subjective as the conduct must be "reasonably likely" to deter the protected activity, even by the charging party.

For purposes of our analysis, we will assume that the transfer met the *Ray* standard. However, this does not save Vasquez's retaliation claim because he has failed to show a causal link.[49] The protected activity occurred thirteen months prior to the alleged adverse action.[50] Further, Vasquez has not shown that the county's proffered reason—that he disobeyed a direct order—was pretextual.[51] Therefore, we affirm the dismissal of this claim as well.

---

43. *B.K.B.*, 276 F.3d at 1100.

44. *Kortan*, 217 F.3d at 1112.

45. 217 F.3d 1234.

46. *Id.* at 1242–43; *see also* EEOC COMPLIANCE MANUAL § 8 "Retaliation" ¶ 8008 (1998).

47. *Ray*, 217 F.3d at 1243.

48. *Id.* at 1242–43 (quoting EEOC COMPLIANCE MANUAL § 8 "Retaliation" ¶ 8008 (1998)) (emphasis added).

49. *Kortan*, 217 F.3d at 1112.

50. *See, e.g., Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir.2002) (finding no causal link when protected activity occurred "nearly a year and a half" before adverse employment action).

51. *Ray*, 217 F.3d at 1240, 1244.

## VI.

Vasquez's disparate treatment claim fails because he did not suffer from any adverse employment action. Berglund did not subject Vasquez to a hostile work environment, and therefore, Vasquez's claim of harassment fails as well. Finally, we must dismiss Vasquez's retaliation claim because he did not exhaust his administrative remedies as to part of his claim, and assuming that the transfer is an adverse employment action, he has not shown either a causal link or that the employer's proffered reason was pretextual. For these reasons, we affirm the district court's dismissal of Vasquez's claims.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

I respectfully dissent. Today, the majority reaches beyond the facts of this case and imposes a new requirement on Title VII claimants to show the objective adversity of a discriminatory employment action, thereby narrowing the scope of Title VII's protections. In addition, the majority erroneously holds that Francisco Vasquez ("Vasquez") was unable to make a *prima facie* case of retaliation, finding no causal link between the protected activity and the adverse employment action despite the evidence Vasquez offered. Alternatively, they hold that Vasquez was unable to show that his employer's stated reason for the transfer was pre-textual. Finally, the majority errs in dismissing Vasquez' hostile work environment claim as a matter of law. In so doing, it improperly downplays the pervasiveness of the hostile environment created by the ongoing harassing conduct of Kelly Berglund ("Berglund") and wholly fails to address the role that Vasquez' employer played in sanctioning, rather than correcting, the harassment in violation of Title VII.

## I. DISPARATE TREATMENT CLAIM

I disagree with the majority's conclusion that Vasquez has not proffered sufficient evidence for a reasonable jury to find that he suffered an adverse employment action as to his disparate treatment claim. In reaching this conclusion, the majority imposes an objective adversity requirement for determining whether an employee has been subjected to an adverse employment action in a disparate treatment claim. In doing so, the majority narrows the protections of Title VII.

Instead, under the appropriate test, the adversity of an employment decision is found in the change of terms and conditions of a person's employment, regardless of whether it is viewed as preferable or unfavorable. Under this test, Vasquez has proffered sufficient evidence to show that the transfer materially affected the terms and conditions of his employment.

### A. MATERIAL CHANGE IN TERMS AND CONDITIONS OF EMPLOYMENT

The majority concludes that Vasquez' transfer was not an adverse employment action because the detriment is "purely subjective." However, Vasquez has proffered evidence that his transfer constituted a material alteration of the terms and conditions of his employment. Thus, it was improper to reach the question whether his subjective preference *alone* could establish that he suffered an adverse employment action.

An adverse employment action is shown if the employer's decision imposed a "material change in the terms and conditions of a person's employment." *Chuang v. Univ. of Cal.*, 225 F.3d 1115, 1126 (9th Cir.2000); *accord Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818–19 (9th Cir.2002); *see also* 42 U.S.C. § 2000e 2(a) (prohibiting employers from discriminating "against any individual with respect to his compensation, *terms, conditions,* or

privileges of employment, because of such individual's race, color, religion, sex, or national origin") (emphasis added). The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination ... and that it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Nat'l R.R. Passenger Corp. v. Morgan*, —— U.S. ——, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002) (alteration in original) (internal quotation marks and citations omitted). Indeed, the statutory phrase "terms, conditions, or privileges of employment," "evinces a congressional intent to strike at the entire spectrum of disparate treatment ... in employment.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Meritor Sav. Bank, FSB. v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

In contravention of Title VII's broad coverage of intangible—as well as tangible—harms, the majority erects a new requirement that the employment action must be *objectively* adverse. The majority reasons that, "[o]therwise, every minor employment action that an employee did not like could become the basis of a discrimination suit." Maj. Op. at 891. In doing so, the majority ignores that the evil Title VII aims to eradicate is *discriminatory* treatment in the workplace, not particular employment actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("Title VII tolerates no racial discrimination, subtle or otherwise."); *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 364 (2d Cir. 1980) ("Recognizing that job discrimination may take many forms, Congress cast the prohibitions of Title VII broadly to include subtle distinctions in the terms and conditions of employment. . . .").

If the majority is concerned about opening the floodgates to meritless claims, our inquiry should focus on whether the action was too minor to be actionable under Title VII. Section 2000e 2(a) prohibits employment practices that "discriminate against any individual with respect to his compensation, *terms, conditions, or privileges* of employment because of such individual's race, color, religion, sex, or national origin." (emphasis added). If a material term or condition of employment has not been altered, no Title VII violation has occurred. However, such is not the case before us.

## B. VASQUEZ' TRANSFER TO A FIELD DPO I POSITION

Applying the material terms and conditions of employment test explained above, Vasquez' transfer constitutes an adverse employment action. Vasquez alleges that he suffered an adverse employment action when he was transferred from his position as a resident deputy probation officer I ("DPO I") at the Turquoise cottage of the Dorothy Kirby Center ("DKC") to a field DPO I position. As a resident DPO I, Vasquez worked as part of a therapeutic team, which had primary responsibility for the rehabilitation of minors residing at the Turquoise cottage. However, as a field DPO I, Vasquez rotates between cottages, spends more of his time on administrative tasks and in contact with parents of minors at DKC, and has only sporadic contact with the minors themselves. Consequentially, Vasquez' opportunity to form influential relationships with the minors and to have an impact on their lives is greatly reduced.

The job description for a DPO I includes providing "for the care, safety and control of minors in camp." Thus, the position of a DPO I is designed expressly with the purpose of interacting with and caring for

the minors residing at DKC. Accordingly, a transfer that deprives a DPO I of those same opportunities because his new position entails more administrative work, more contact with parents, and less time with the minors changes the "terms" and "conditions" of that employee's employment. That the harm is "intangible" does not bring it outside the ambit of Title VII. *See Morgan,* 122 S.Ct. at 2074. Because that is what occurred in this case, Vasquez has proffered sufficient evidence of an adverse employment action to defeat summary judgment on his Title VII disparate treatment claim.[1] *See Chuang,* 225 F.3d at 1126 (holding that the relocation of the plaintiff's laboratory space was an adverse employment action because it "constitutes a material change in the terms and conditions of ... employment.").

The majority acknowledges that "a field DPO has more administrative duties and less interaction with the youth." Maj. Op. at 890. Nevertheless, it finds that Vasquez' "preference to work in a cottage was purely subjective, as evidenced by the fact that other DPO I's had requested transfers from cottage assignments to the field." Maj. Op. at 891. Although other DPO I's may prefer the field position because, for example, they would like to spend more time working with parents and alternating among different groups of minors, their subjective preferences are immaterial. *Cf. Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 338 n. 18, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("Title VII provides for equal opportunity to compete for any job, whether it is thought better or worse than another.") (citations omitted).

It is ironic that the majority relies on evidence of the subjective preferences of other DPO I's to deny Vasquez' claims as a matter of law. Yet, with the standard set forth today, this improper weighing of preferences is inevitable. Indeed, it is a truism that "[o]ne man's meat is another man's poison." Ernest F. Lidge III, *The Meaning of Discrimination: Why Courts Have Erred in Requiring Employment Discrimination Plaintiffs to Prove that the Employer's Action Was Materially Adverse or Ultimate,* 47 U. KAN. L. REV. 333, 356 (1999) (citation omitted). Because each individual has different purposes and preferences with respect to his or her life's work, the requirement of objective adversity is simply an inadequate indicator for determining whether an employee has an actionable claim of discrimination under Title VII.

Further, even if the proper inquiry is whether a "reasonable" employee would view the transfer as adverse, such an inquiry does not require a consensus among *each person* in Vasquez' position that the field position is less desirable than a cottage assignment. Rather, the question is whether Vasquez is reasonable in viewing his transfer as disadvantageous. The majority fails to address this issue. Moreover, its observation that some DPO I's preferred the field position underscores precisely why this question should be left to the providence of the jury, not judges to determine as a matter of law.

## C. CIRCUMSTANCES SURROUNDING VASQUEZ' TRANSFER

The majority fails to consider the relevant facts and circumstances surrounding

---

[1]. Our decisions in the retaliation context further demonstrate that Vasquez' transfer constitutes an adverse employment action. *See Ray,* 217 F.3d at 1241 (finding that a lateral transfer constitutes an adverse employment action); *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) ("Transfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions.'"); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1113 (9th Cir.2000) (distinguishing *Yartzoff* because plaintiff's negative evaluation was not accompanied by "different or more burdensome work responsibilities").

Vasquez' transfer. Even under the objective adversity test set forth by the majority, we should consider the particular circumstances surrounding the transfer to determine whether it constituted an adverse employment action. Vasquez' transfer was accompanied by a warning letter and statements of DKC Director Karma Leeds ("Leeds"), which indicated that his transfer was necessary because he lacked the judgment to have a position of influence with the minors. The majority relegates to a footnote its conclusion that Leeds statements do not "affect[ ] our analysis" because they do "not change the fact that the action itself ... was not adverse or disadvantageous when considered objectively." Maj. Op. at 891 n. 19. It also rejects the assertion that the warning letter was an adverse employment action because it had "no detrimental effect on Vasquez." Maj. Op. at 892.

Yet, the Eleventh Circuit case upon which the majority relies stated that the proper inquiry was whether "a reasonable person in his position would have found his transfer to be adverse under all the facts and circumstances." *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1453 (11th Cir.1998). Here, the warning letter and Leeds' statements could lead a reasonable person to believe that the transfer to the field position was not simply a lateral move, but a punitive employment action. *See Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir.2000) (recognizing that the existence of an adverse employment action can turn on "indices

that might be unique to a particular situation") (internal quotation marks omitted).

In addition, it is relevant that the employment action taken was the very one that Vasquez had resisted at every step, even to the point of passing up promotions and withdrawing a grievance of racial and sexual discrimination against Berglund,[2] to avoid the transfer to the field. Under these circumstances, Vasquez could reasonably have understood the transfer to be an adverse action. *See Dilenno v. Goodwill Indus.*, 162 F.3d 235, 236 (3d Cir.1998) (holding that a lateral transfer from store tagger to clothes processing was an adverse employment action when the employer knew that the employee had a phobia of "critters" found in donation bags and that she would be unwilling to do that particular job).

In short, the majority errs in holding as a matter of law that Vasquez has not suffered an adverse employment action. Moreover, it improperly raises the bar today for employees who have suffered discrimination in violation of Title VII. Further, even under its new standard, it is a question for the jury whether, under all the facts and circumstances, a "reasonable person in the same situation would view the action as disadvantageous." Maj. Op. at 891; *see Doe*, 145 F.3d at 1453; *see also Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir.1997) (affirming jury determination that employment action was adverse). It is inappropriate for the majority to speculate as to whether Vasquez could proffer evidence that he was reasonable in viewing the transfer as an adverse action. Thus, I would reverse summary judgment on this ground.[3]

---

2. Berglund was a more senior employee who served as a DPO II at the Turquoise cottage. As a DPO II, she had some supervisory responsibilities over the DPO I's at the cottage. In addition, she apparently served as the acting director of DKC from time to time.

3. Vasquez also established the other elements of his prima facie case. Under *McDonnell Douglas*, he must show: (1) he is a member of a protected class, (2) he was qualified, (3) an adverse employment action, and (4) similarly-situated non-class members were treated more favorably. *Aragon v. Republic Silver*

## II. RETALIATION CLAIM

To sustain his retaliation claim, Vasquez must show: "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000). The majority holds that Vasquez' retaliation claim fails because Vasquez did not show a causal link between the protected activity and the adverse employment action. Alternatively, the majority states that Vasquez failed to establish that the stated reason for the transfer was pre-textual. However, I would find that Vasquez made out a prima facie case of retaliation with regard to all three elements.

First, Vasquez showed that "he engaged in a protected activity" when he filed the February 1998 grievance regarding Berglund's discriminatory statements.

Second, Vasquez has shown that his employer subjected him to an adverse employment action. In *Ray v. Henderson*, we adopted a broad test for evaluating alleged adverse employment actions in the context of Title VII retaliation claims. Specifically, we held that, for purposes of Title VII retaliation claims, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Id.* at 1242–43. We adopted the Equal Employment Opportunity Commission's ("EEOC") test for such actions, reasoning that its standard is "consistent with our prior case law and effectuates the language and purpose of Title VII." *Id.* (relying on EEOC Compliance Manual Section 8, "Retaliation," Par. 8008 (1998)). The EEOC, in turn, adopted this test "based on statutory language and policy considerations." EEOC Compliance Manual, § 8–II(D)(3) (1998). Retaliation claims are governed by 42 U.S.C. § 2000e–3(a), which provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made

State Disposal, Inc., 292 F.3d 654, 659–660 (9th Cir.2002) (amended opinion). The burden then shifts to the County "to articulate a legitimate, non-discriminatory reason for [the adverse action]." *Id.* at 659–660 (citation omitted). If the County does, Vasquez must proffer evidence of pretext. *Id.*

First, Vasquez is protected as a Hispanic male. Second, his qualifications are not in dispute. Third, as shown above, Vasquez raised a triable issue as to the adverse employment action. Fourth, he proffered sufficient evidence that he was treated differently than a similarly-situated employee because Mario Ng, also a DPO I, was not transferred for participating in the March 27, 1999 football game.

The County asserts as its non-discriminatory reason for the transfer Vasquez' alleged disobedience of a direct order from Berglund, his supervisor at the time. Vasquez proffers both direct and circumstantial evidence of pretext.

Berglund's explicit epithets constitute direct evidence of discrimination. *Godwin v. Hunt*

Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). Although Leeds made the ultimate transfer decision, Berglund's report "set in motion the chain of events that led to ... the adverse employment action." *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999). Whether Berglund was sufficiently involved in the decision to impute her discriminatory animus to the County is a jury question. *Godwin*, 150 F.3d at 1221.

Vasquez proffered, as circumstantial evidence of pretext, his testimony that Berglund did not forbid him from playing football. *Aragon*, 292 F.3d at 659–60. In addition, Leeds' threat to transfer him when he filed a grievance regarding Berglund's statements tends to show a discriminatory motive. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817 (holding that evidence of pretext may include the employer's "reaction, if any, to [the plaintiff's] legitimate civil rights activities"). Thus, Vasquez raised a triable issue as to his disparate treatment claim.

an unlawful employment practice by [Title VII]."

While the majority assumes "that the transfer met the *Ray* standard," I would explicitly find that an adverse employment action in fact exists for purposes of Vasquez' retaliation claim. Maj. Op. at 890. Vasquez' transfer from the Turquoise cottage to the field position constitutes an adverse employment action if it was "reasonably likely to deter [him] from engaging in protected activity." *Ray*, 217 F.3d at 1242–43. This is a unique case in which the facts show that the transfer *actually did deter* Vasquez from engaging in protected activity. In fact, Vasquez withdrew his grievance against Berglund after Leeds told him that the only solution to the conflict between them was to transfer him out of the Turquoise cottage, and that the only way he could avoid the transfer was to withdraw his grievance against Berglund. He promptly did. Thus, Vasquez raised a triable issue as to the adverse employment action since a reasonable jury could find that the transfer was reasonably likely to deter Vasquez' protected activity.

Third, Vasquez proffered sufficient evidence that a causal link existed between the protected activity and the adverse action. Although the passing of the year between his protected activity (February 1998) and the transfer (March 1999), standing alone, is probably too long to raise an inference of discrimination, Vasquez also proffered evidence of Berglund's retaliatory motive and prior attempts to have him transferred. For example, in a memo dated March 20, 1998, Berglund wrote to Leeds: "It seems clear beyond a doubt that Mr. Vasquez[ ] may not be the ideal candidate to work in a cottage with the minors at DKC." Vasquez also testified that Berglund threatened to "get" him and attempted to pressure him into transferring out of the Turquoise cottage.

Despite this evidence, the majority finds that Vasquez failed to show a casual link, citing our decision in *Villiarimo* for the proposition that the year between Vasquez' protected activity and the adverse employment action severed the causal link. In *Villiarimo*, we held that "a nearly 18 month lapse between protected activity and an adverse employment action is simply too long, *by itself*, to give rise to an inference of causation." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d at 1065 (emphasis added). The critical difference in the instant case is that timing was not the sole evidence of causation that Vasquez proffered. As noted earlier, Vasquez provided evidence of Berglund's racially discriminatory comments as well as her prior efforts to have him transferred to the field.

Additionally, the majority holds that Vasquez' retaliation claim fails because Vasquez has not shown that the county's proffered reason—that he allegedly disobeyed a direct order—for the adverse action was not pre-textual. The majority errs in drawing this conclusion because, as noted previously in our discussion of Vasquez' disparate treatment claim, Vasquez offered both direct and circumstantial evidence of pretext. Berglund's explicit racial epithets, Vasquez' testimony that Berglund did not forbid him from playing football, and Leeds' threat to transfer him when he filed a grievance all support a finding of a triable issue as to his retaliation claim.

## III. HOSTILE WORK ENVIRONMENT CLAIM

Finally, I disagree with the majority's determination that Vasquez' hostile work environment claim fails as a matter of law. To survive summary judgment, Vasquez must raise a triable issue as to whether: (1) he was "subjected to verbal or physical conduct" because of his race and sex; (2) "the conduct was unwelcome"; and (3)

"the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Kang*, 296 F.3d at 817–18 (internal quotation marks and citation omitted). At issue here is whether a reasonable jury could find that the harassing "conduct was sufficiently pervasive 'to alter the conditions of [Vasquez'] employment and create an abusive working environment.'" *Pavon v. Swift Transp., Inc.*, 192 F.3d 902, 908 (9th Cir.1999) (quoting *Meritor Sav. Bank, FSB.*, 477 U.S. at 67, 106 S.Ct. 2399).

Vasquez has proffered evidence that Berglund directed epithets at him and engaged in a campaign of harassment against him because of his race and sex.[4] He has also demonstrated that his employer did nothing to stop the harassment. To the contrary, his employers were aware of the harassment but tolerated it. I will address both of these aspects of the hostile work environment in turn.

**A. BERGLUND'S HARASSING CONDUCT**

As the majority recognizes, Vasquez proffered evidence of bigoted statements directed at him by Berglund. She told Vasquez that because he was Hispanic and male, "he was too aggressive, macho and domineering with the minors." She also stated that he had a "typical Hispanic macho attitude" and needed to be less aggressive with the minors. These statements were openly hostile to Vasquez and suggested that he was dangerous and unqualified to work with minors because of his race and sex. In addition, Berglund later told Vasquez that he should transfer out of the Turquoise cottage because "Hispanics do well in the field. You'll be better off.

You'll get days off." This statement revealed Berglund's stereotype of Hispanics as lazy and unambitious.

However, the hostility toward Vasquez did not stop there. Instead, Berglund engaged in a campaign of deprecation and harassment, the aim of which can only be interpreted as an attempt to cast Vasquez as incompetent and to have him transferred out of the Turquoise cottage. Berglund's harassing conduct included: filing a number of false and harassing complaints against Vasquez, as well as threatening him with reprisals and with revenge (that she would "get" him). In addition, Berglund subjected Vasquez to public humiliation, screaming at him in front of the minors on several occasions. During one of these episodes, Berglund publicly accused Vasquez of permitting the minors to get high by sniffing fresh paint. During another, she berated him and called him a "juvenile delinquent."

The majority recognizes that Vasquez proffered some evidence of Berglund's "unfair treatment," but fails to consider them in the backdrop of ongoing discriminatory behavior alleged by Vasquez. Maj. Op. at 894. Yet, Berglund's repeated attacks on Vasquez' competence and character are inextricably part of the pattern of racial and sexual hostility that Berglund exhibited against Vasquez. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir.1998). As we stated in *Draper*, "[d]iscriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstance may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a

---

4. The majority states that Vasquez' claim is one for "racially based harassment." Maj. Op. at 892. However, Vasquez asserts that he was harassed because of the confluence of his race and sex, both of which are protected characteristics under Title VII. 42 U.S.C.

§ 2000e-2(a)(1) (forbidding employment discrimination on the basis of race or sex); *cf. Lam v. Univ. of Haw.*, 40 F.3d 1551, 1561–62 (9th Cir.1994) (recognizing combined race and sex discrimination claims under Title VII).

worker to feel demeaned, humiliated, or intimidated on account of [his race and gender]." *Id.* Indeed, Berglund's allegedly false complaints, such as her claim that Vasquez exhibited "inappropriate and provocative behavior with the individual minors," were consistent with her stereotyping that he was too domineering with the minors and had a "typical Hispanic macho attitude." *See Allen v. Mich. Dep't of Corrections,* 165 F.3d 405, 411 (6th Cir. 1999) (finding support in plaintiff's claim that he was "treated unfairly" because his allegation of being more closely monitored than white employees was consistent with his supervisor's statement that "niggers can't be trusted").

Discounting the ongoing nature of the harassment and finding only "isolated offensive remarks" and "complaints of unfair treatment," the majority concludes that Vasquez has not proffered sufficient evidence of severe or pervasive harassment to survive summary judgment. In so doing, the majority compares Vasquez' allegations to the facts of other cases to conclude that he has not suffered severe or pervasive harassment. However, it is a violation of individual justice to claim that, just because the discrimination in this case was not as severe or pervasive as some of those cases in which we found discrimination, Vasquez has no remedy. The issue is not whether the discrimination was as severe or pervasive as in other cases, but whether Vasquez has presented sufficient facts to have his case decided by a jury.

Here, Vasquez proffered evidence that he was subjected to "derogatory racial [and sexual] insults," which were directed *at him* personally. *Allen,* 165 F.3d at 410–11 (reversing summary judgment for the employer on a hostile work environment claim when the employee's superiors told him that "he was lazy like the rest of his people and that is why they are all in prison," "I'm writing your black ass up,

and niggers can't be trusted."); *cf. Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1110–11 (9th Cir.2000) (affirming summary judgment when only one offensive comment was directed at the employee). Berglund also publicly humiliated and demeaned Vasquez, yelling at him in front of the minors and filing false charges against him. *Ray,* 217 F.3d at 1245–46 (reversing summary judgment when the employee's supervisors "regularly yelled at him during staff meetings; ... called him a 'liar,' a 'troublemaker,' and a 'rabble rouser,' and told him to 'shut up' ").

The tenor of the majority opinion is that Vasquez' claim fails because he simply experienced an interpersonal conflict with Berglund. *See* Maj. Op. at 887, 894. It is beyond dispute that a personality conflict is insufficient to trigger the protections of Title VII. However, this is not the case at hand. Vasquez has proffered evidence that his "conflict" with Berglund originated from her discriminatory statements and the animus she harbored against him as a Hispanic male. This evidence, combined with the allegations of her humiliating comments and false accusations, sufficed to raise a triable issue as to whether Vasquez was subjected to an abusive workplace because of his race and his sex.

## B. THE COUNTY'S COMPLICITY IN THE HARASSMENT

The majority overlooks the actions of Vasquez' employer in analyzing his hostile work environment claim. However, the failure of his superiors to do anything to stop or to remedy the known harassment by Berglund is a violation of Title VII in and of itself.

We have held that, "[b]y tolerating sexual harassment against its employees, the employer is deemed to have adversely changed the terms of their employment in

violation of Title VII." *Swenson v. Potter,* 271 F.3d 1184, 1191 (9th Cir.2001) (citing *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir.2000)). "If the employer fails to take corrective action after learning of an employee's sexually[or racially] harassing conduct, or takes inadequate action that emboldens the harasser to continue [her] misconduct, the employer can be deemed to have 'adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.'" *Id.* at 1192 (last alteration in original) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). In such cases, it is the "adequacy of the employer's response, not the co-worker's underlying behavior" that is alleged to be discriminatory. *Id.* at 1191 (identifying relevant conduct for determining whether the plaintiff's claim was time barred).

Here, both Leeds and Vasquez' direct supervisor, Star French ("French"), were aware of Berglund's discriminatory conduct, but did nothing to stop it. In fact, when Vasquez filed a grievance concerning Berglund's statements that he had a "typical Hispanic macho attitude," Leeds informed Vasquez that the only step she would take to remedy the situation was to transfer him from the Turquoise cottage. Further, the only way that he could avoid the transfer was by withdrawing his grievance.

In addition, French testified at her deposition that she had encouraged Vasquez to transfer away from Berglund and could not understand why he would not. She lamented to him: "Oh my God, let the pain end. Stop the pain. Do you enjoy the pain?" Thus, French was fully aware of Berglund's harassment of Vasquez, but she did nothing to alleviate the hostility of the situation.

Neither Leeds nor French took "corrective action" that was "reasonably calculat-

ed to end the harassment." *Id.* at 1192 (citations omitted). Rather, Leeds' threat to transfer Vasquez only demonstrated to both him and Berglund that their employer would permit the harassment to continue. In fact, the lack of corrective action emboldened Berglund, who continued to make further discriminatory statements, such as her derisive suggestion that Vasquez transfer because the field was "good" for Hispanics. Under these "circumstances, the non-action by the employer can fairly be characterized as acquiescence, i.e., having changed the terms and conditions of employment to include putting up with harassment from other employees." *Brooks,* 229 F.3d at 924 n. 4.

In short, Vasquez was subjected to explicit racial and sexual epithets, as well as ongoing harassment by Berglund. Whether the harassment was sufficiently severe or pervasive to constitute a hostile working environment under Title VII should be left to the jury to determine. Further, the inaction of Vasquez' employer exacerbated, rather than corrected, the hostility of the workplace. As the Supreme Court stated in *Oncale,* "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 523 U.S. at 81–82, 118 S.Ct. 998. Under the totality of the circumstances, a reasonable jury could conclude that Vasquez was subjected to "a pattern of ongoing and persistent harassment severe enough to alter the conditions of [his] employment." *Morgan v. Nat'l RR Passenger Corp.,* 232 F.3d 1008, 1017 (9th Cir. 2000), *rev'd in part on other grounds,* —— U.S. ——, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (citations omitted). In the alternative, a reasonable jury could find that the failure of Vasquez' employer to stop the harassment "changed the terms and condi-

tions of [his] employment to include putting up with harassment" from Berglund. *Brooks,* 229 F.3d at 924 n. 4.

## IV. CONCLUSION

Under Title VII, an employee has a "right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB.,* 477 U.S. at 65, 106 S.Ct. 2399. Here, Vasquez has proffered evidence that he was subjected to an adverse employment action because of his race and sex, as well as his protected activities. He also proffered evidence that he was subjected to an abusive workplace because he is a Hispanic male, and that his employer failed to do anything about it. The proffered evidence is sufficient to survive summary judgment, and Vasquez' claims of disparate treatment, hostile work environment, and retaliation should go to a jury. Accordingly, I dissent.