Shirley **GREEN**, Plaintiff,

v.

**MARICOPA COUNTY COMMUNITY COLLEGE SCHOOL DISTRICT,** Defendant.

No. 01–0075–PHX–ROS.

United States District Court, D. Arizona.

May 14, 2003.

---

Tod F Schleier, Bradley Hugh Schleier, James M Jellison, Schleier Jellison & Schleier PC, Phoenix, AZ, for Plaintiff.

Richard S Cohen, Lewis & Roca LLP, Phoenix, AZ, for Defendant.

## ORDER

SILVER, District Judge.

On March 31, 2003, the Court issued an Order [Doc. # 110] granting Defendant's two motions for summary judgment, and promising that a written opinion would follow. This is that opinion. Plaintiff, Dr. Shirley Green, is suing her employer, Defendant Maricopa County Community College District, for discrimination on the basis of race (African–American) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On August 2, 2002, Defendant filed Motion for Summary Judgment Regarding Plaintiff's Non–Advancement Claims [Doc. # 73] and Motion for Summary Judgment Regarding Promotion and Job Upgrade Issues [Doc. # 75]. Also pending is Plaintiff's Motion to Strike Defendant's Statement of Facts in Support of Motion for Summary Judgment Re Non–Advancement [Doc. # 86], Plaintiff's Motion to Strike Defendant's Statement of Facts in Support of Motion for Summary Judgment Re Promotion and Job Upgrade [Doc. # 84], and Defendant's

Motion to Strike Plaintiff's Statement of Facts in Support of Response to Defendant's Motion for Summary Judgment [Doc. # 104]. For the reasons explained below, the Court granted summary judgment on all claims.

## I. FACTUAL BACKGROUND

Plaintiff Dr. Shirley Green is an Associate Dean of Student Services at Paradise Valley Community College ("PVCC"), a school run by Defendant, the Maricopa County Community College District ("the District"). PSOF ¶ 12. She holds a bachelors degree, two masters degrees, and a doctorate. PSOF ¶ 1. In 1988, Plaintiff was hired by PVCC as an adjunct instructor in the counseling department, becoming the first black faculty member hired at PVCC. PSOF ¶¶ 3, 4. In May 1990, Plaintiff became the Director of Admissions and Records, and was assigned to Building "B," the Student Services Building. PSOF ¶ 7. In spring 1993, Plaintiff was promoted to Associate Dean of Student Services, and subsequently took on greater responsibilities in a number of areas, such as financial aid and testing. PSOF ¶ 10. From 1990 to the time of this lawsuit, Plaintiff was the only black administrator at PVCC. PSOF ¶ 9.

Dr. Raul Cardenas ("Cardenas") became President of PVCC in 1992, and remained in that position until June of 1999. PSOF ¶ 16. Georgina Kranitz ("Kranitz"), currently President of PVCC, was hired as Dean of Administrative and Student Services when Cardenas became President in 1992. PSOF ¶¶ 18–20. As Associate Dean, Plaintiff was directly supervised by Kranitz. PSOF ¶ 21. As early as 1993 and 1994, Plaintiff informed both Kranitz and Cardenas that she aspired to become a full Dean. PSOF ¶¶ 38, 39. Upon Cardenas's advice, she applied for and became a Kellogg fellow in 1993–94, participating in a national leadership training program. PSOF ¶ 39. Around this time, Plaintiff

spoke to Kranitz about becoming more "promotable," and Kranitz told her to become more "visible" on campus, meaning to "be much more involved in campus activities and working with various committees." PSOF ¶ 45, Kranitz Depo. at 36. From 1993 forward, Plaintiff served on a number of committees and participated in a number of programs on both the College and District level. PSOF ¶¶ 46–51, 53–56.

Nevertheless, Plaintiff had a strained working relationship with both Kranitz and Cardenas. In 1994, Plaintiff had a dispute with Kranitz that resulted in Kranitz writing a letter to Cardenas describing her and Plaintiff's relationship as "adversarial." Exh. 6 to DSOF; Green Depo. at 384. Kranitz testified that by May 1997, her relationship with Plaintiff was still "strained." Kranitz Depo. at 157. Dr. Fred Stahl, then the Dean of Instruction, described the relationship between Plaintiff and Kranitz as "dysfunctional." Stahl Depo. at 26; Stahl Email Exh. 7 to DSOF. Further, in early August of 1998, Cardenas and Plaintiff had a dispute about whether Plaintiff had complied with an order to hire full-time Spanish-speaking staff, and Cardenas sent Plaintiff an email criticizing her attitude. PSOF ¶ 121, 123; Exh. 24 to PSOF. In early September 1998, Cardenas and Plaintiff clashed about whether Plaintiff followed an order to hire a permanent staff member for recruiting, and Cardenas sent Plaintiff an email stating that Plaintiff's actions "can be considered as insubordination." Exh. 25 to PSOF; Kranitz Depo. at 132–3.

Prior to 1998, there were two Associate Dean of Student Services positions, each with separate responsibilities. In December of 1995, after the other Associate Dean position became vacant, Plaintiff proposed that the positions be merged and that she assume the other Associate Dean's functions, a proposal which was denied. PSOF

¶ 63, Exh. 12 to PSOF, Green Depo. at 126–7. Again in early 1996, Plaintiff wrote an email to Cardenas requesting that she be given the opportunity to accept more responsibilities of the other position, contending that she was "underutilized." PSOF ¶ 6, Exh. 8 to PSOF. The position was not given to Plaintiff, and it again became vacant in 1997, at which time PVCC hired Dr. Paul Dale ("Dale"), who had not previously worked for the District, as an Associate Dean. PSOF ¶ 35.

On September 10, 1998, Cardenas announced that PVCC would create a new position of Dean of Student Services, and that Dale, a white male, would be promoted to that position. PSOF ¶ 66. The position of Dean of Student Services was formed as part of a reorganization, and absorbed duties previously performed by Kranitz. PSOF ¶ 73, Cardenas Depo. at 46, 48–49. Cardenas testified that he made the decision alone, and that he seriously considered only two candidates for the position, Plaintiff and Dale, the two Associate Deans of Student Services. PSOF ¶ 67, Cardenas Depo. at 44, 47. In fact, although he indicated that "at one point, Dr. Green would have been a candidate," Cardenas also testified that he told his Deans that he "was leaning towards Paul Dale," and that "I think my mind was made up that I was going to go in this direction [of picking Dale]." Cardenas Depo. at 46–7. The position was not posted and no interviews were held. PSOF ¶ 80–82. Dale first became aware of the new position when Cardenas invited Dale into his office, told him he was planning the reorganization, and asked him if he would be interested in the position. PSOF ¶ 69, Dale Depo. at 23–4. Dale had a few more meetings with Cardenas and at least one with Kranitz before he received the promotion to Dean of Student Services, at which point he became Plaintiff's supervisor. Dale Depo. at 27–30.

Plaintiff filed a complaint with the District in October 1998, alleging race discrimination in the selection of Dale as the new Dean of Students. An Equal Employment Opportunity investigator employed by the District, Teresa Toney, conducted an investigation into Plaintiff's complaints. PSOF ¶ 137. She concluded, in a January 11, 1999 letter to Plaintiff, that "it is the determination that the extent to which actions have resulted in perceived or actual different treatment were not done with the intent to discriminate due to your race." Exh. 28 to PSOF. Plaintiff then filed a complaint with the EEOC on February 19, 1999. PSOF ¶ 157. The EEOC issued an Amended Determination Letter on March 28, 2000, finding "reasonable cause to believe that Respondent discriminated against [Plaintiff], based on race, by denying her promotion to the position of Dean of Students." PSOF ¶¶ 172, 176, Exh. 35 to PSOF. Thereafter, Plaintiff timely filed this lawsuit.

## II. LEGAL ANALYSIS

### A. Legal Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Jesinger*, 24 F.3d

at 1130. In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, ... [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

■ The analysis of a disparate treatment claim under Title VII is governed by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *See Llamas v. Butte Cmty. Coll. Dist.,* 238 F.3d 1123, 1126 (9th Cir. 2001). In order to prevail, the plaintiff must then show that the employer's purported reason for the adverse employment action is merely a pretext for a discriminatory motive. *Id.*

■ The plaintiff's prima facie case requires a showing that "give[s] rise to an inference of unlawful discrimination." *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). The plaintiff may establish a prima facie case by presenting direct evidence of discriminatory intent. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998); *see also Tempesta v. Motorola, Inc.,* 92 F.Supp.2d 973, 979–980 (D.Ariz.1999). Alternatively, a plaintiff can establish a prima facie case circumstantially, by meeting the four requirements outlined in *McDonnell Douglas:* the plaintiff (1) is a member of a protected class, (2) performed according to the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than other employees similarly situated. *See Chuang v. University of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1123 (9th Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Finally, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994).

■ "Once a prima facie case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis,* 26 F.3d at 889. The burden then shifts back to the plaintiff to show that the employer's stated reason is a pretext. *See Godwin,* 150 F.3d at 1220 (9th Cir.1998). At the pretext stage, "[w]hen the plaintiff offers direct evidence of dis-

criminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221. However, where plaintiff relies on indirect evidence to show that the defendant's stated motive is not the actual motive, "[s]uch evidence ... must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex." *Id.* at 1222.

### B. Overview of Plaintiff's Claims

██ Plaintiff's First Amended Complaint alleges a number of claims of disparate treatment under Title VII, some of which are time-barred. Plaintiff filed her EEOC complaint on February 19, 1999. Pursuant to 42 U.S.C. § 2000e–5(e)(1) and *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002), Plaintiff may only challenge discrete acts of discrimination which took place within 300 days of filing the EEOC complaint, meaning acts that took place after April 25, 1998. The parties agree that three of Plaintiff's claims are timely brought: discriminatory office location and signage, failure to be appointed to the Cultural Diversity Committee, and failure to be promoted or upgraded. Def's Motion [Doc. # 73] at 4–5, Pl's Response [Doc. # 85] at 2. Plaintiff's other claims, including allegations of removal from a number of committees, are time-barred, though such evidence is admissible to support her timely claims. *See Morgan,* 122 S.Ct. at 2072 (time-barred acts admissible as background evidence). The Court will address each of Plaintiff's three timely claims in turn.

### C. Plaintiff's Office Location and Signage

██ Plaintiff alleges that she was subject to disparate treatment because her office was "segregated" from the offices of other administrators. Plaintiff has two interrelated complaints about her office location. First, she contends that her office was located in Building "B", while every other Associate Dean's office was located in Building "A." Second, Building A was surrounded by more prominent signage; while Building A indicated that the Deans and President occupied its hallways, Building B, the student services building, contained no such prominent signage indicating her presence as an Associate Dean. Plaintiff presents no direct evidence that she was assigned her office for discriminatory reasons. Rather, she must rely on indirect evidence. The Court concludes that she has not presented a prima facie case of disparate treatment.

Plaintiff does not present sufficient evidence to establish a prima facie case because she cannot show that she suffered an adverse employment action. Plaintiff bears the burden of showing that the location of her office and lack of signage constituted an adverse action. To meet her burden, Plaintiff relies on *Chuang,* 225 F.3d at 1126, in which the Ninth Circuit held that the plaintiff was subject to an adverse employment action because "[t]he forcible removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment." In *Chuang,* the plaintiffs, researchers at a university, were subject to a "forcible relocation" of their laboratory, resulting in disruption of projects, loss of funding, damaged equipment, and replacement with substantially inadequate facilities. *Id.* at 1125–6.

██ Plaintiff, unlike the plaintiffs in *Chuang,* cannot show that she suffered a "substantial interference with work facilities important to the performance of a job." Specifically, she identifies no material harm that she suffered because her office was located in a separate building.

In fact, her office was located in the same building as the Admissions and Records Department, which she continued to supervise, and in the same building as her staff, with whom she interacted on a daily basis. Green Depo. at 113, 116, 347–8. She does not allege that her location, or the insufficient signage, interfered with the performance of her job-related duties.[1] Further, under *Vasquez v. County of Los Angeles*, 307 F.3d 884, 891 (9th Cir.2002), Plaintiff must show that her office location was objectively undesirable, not merely that she had a subjective desire to be placed in a different location. *See Vasquez*, 307 F.3d at 891 ("[T]he proper inquiry is to view the action objectively to determine whether it was adverse. Otherwise, every minor employment action that an employee did not like could become the basis of a discrimination suit."). Plaintiff's allegations do not approach the level of severe disruptions in employment conditions found to constitute an adverse action in *Chuang*.

Though Plaintiff does not present evidence that her location disrupted her current job responsibilities, Plaintiff does allege that the "segregation" in Building B caused harm by diminishing her "visibility" in the campus community, hindering her potential for advancement. Plaintiff relies on a Seventh Circuit case, *Bryson v. Chicago State Univ.*, 96 F.3d 912 (7th Cir. 1996), which held, in the university context, that loss of an academic title and loss of committee work constituted adverse employment actions. The Court noted that "subtle indicia of job status and reward thus may, in a particular institution, take on an importance that may be far greater in context than would appear on the out-side. . . . Depriving someone of the building blocks for such a promotion . . . is just as serious as depriving her of the job itself." *Id.* at 916–7. *Bryson* further notes that "[t]he trier of fact must resolve the factual dispute over the reward structure that prevailed at [the university] and how it related to the particular actions in [plaintiff's] case." *Id.* at 917. *See also Vasquez*, 307 F.3d at 890–1 (Ninth and Seventh Circuit definitions of adverse employment actions are generally in accord).

■ Plaintiff's reliance on *Bryson* is misplaced, however, because she has created no factual dispute that her location in Building B and the lack of signage contributed to her ability to get a promotion. Plaintiff still bears the burden of presenting evidence, beyond her own conjecture, that her office location affected her potential for promotion. In *Traylor v. Brown*, 295 F.3d 783, 789 (7th Cir.2002), the Court held that a plaintiff suffered no adverse action where plaintiff "presented no evidence, other than her own conjecture, to establish that she suffered a deprivation of the 'building blocks' for promotion" and "no evidence that the sort of responsibilities she wanted to perform were important to achieve a higher position for which she was otherwise qualified." Furthermore, Plaintiff must present *objective* evidence that an office in Building A would be more beneficial to her in getting a promotion. *See Vasquez*, 307 F.3d at 891. Plaintiff presents no such evidence to link her office location to her potential for a promotion, and no evidence that office location was a "building block."

---

1. Plaintiff testified that students were often confused about her status or role as Associate Dean. *See, e.g.,* Green Depo. at 135 ("Students did not know that I existed in that building as an associate dean."). This evidence does not adequately support Plaintiff's case. For one, her statements about what students told her, if offered to show what the students believed, are inadmissible hearsay. Second, whether or not students recognized her title or status is immaterial to whether Defendant substantially interfered with her *job performance*.

Perhaps Plaintiff merely meant to convey that the location devalued her position as Associate Dean in the eyes of others, but the evidence does not even accomplish this objective. In conclusion, Plaintiff does not establish that her office location constitutes an adverse action under Title VII, and she fails to state a prima facie case.

### D. Committee Assignments

 Plaintiff's second claim of disparate treatment is that she was removed or excluded from a number of committees in favor of non-Black administrators, including Paul Dale. Specifically, Plaintiff contends that she was excluded from a position on the 1998–1999 PVCC Cultural Diversity Committee ("Diversity Committee"). Placement on the 1998–99 Diversity Committee is the only contested committee assignment that is not time-barred. In contrast to her allegations about office location and signage, Plaintiff presents sufficient evidence to show that exclusion from committee assignments could constitute an adverse action. Plaintiff's supervisors have indicated that committee work was a "building block" upon which Plaintiff could reasonably expect her future advancement to depend. *See Bryson,* 96 F.3d at 916–7 (holding loss of committee work may constitute adverse action). Specifically, when Plaintiff asked Kranitz about opportunities for advancement, Kranitz told her to become more "visible" on campus, which Kranitz testified meant to "be much more involved in campus activities and working with various committees." PSOF ¶ 45, Kranitz Depo. at 36. Cardenas also counseled Plaintiff to become more "active" and "visible" to get into a position to be promoted. Cardenas Depo. at 27.

However, Plaintiff provides very little admissible evidence regarding the failure to place her on the Diversity Committee and its materiality. Sometime between 1997 and 1999, Plaintiff volunteered to be on the Diversity Committee and sent a message to Robert Bendotti ("Bendotti") to request a position on the Diversity Committee. Green Depo. at 307–8. Plaintiff contends that Bendotti submitted her as a "resource" to the Diversity Committee, but that she was "not allowed" to serve. Green Decl. ¶ 10. She further contends that a Caucasion female, Jan Downey ("Downey") was "put . . . on" the Diversity Committee sometime during the school year. Green Depo. at 312, Exh. A to Def's Mot. to Strike [Doc. # 104]. Defendant moved to strike this portion of Plaintiff's Declaration for lack of foundation, and the motion will be granted. Plaintiff concedes in her deposition that she has no personal knowledge of the individuals who were recommended to Cardenas to be on the Committee, and she never spoke to Bendotti about why she had not been placed on the Committee.[2] Green Depo. at 310–11. Also, she does not provide admissible evidence establishing whether Downey was an original member of the Committee or was a late replacement. Green Depo. at 313. At most, Plaintiff can show that Plaintiff expressed an interest in the Diversity Committee, but was not selected for it, and at least one Caucasian was selected.

As a race-neutral explanation, Defendant contends that membership on the Committee was restricted to faculty members in 1998 and 1999, and that Downey was a faculty member at that time. Kranitz Decl. ¶ 8, Exh. 5 to DSOF. In response, Plaintiff does not challenge Downey's sta-

---

**2.** Plaintiff submits an email that Bendotti sent her that provides some explanation whether her name was actually submitted. Exh. 6 to PSOF. The email, however, without further explanation, lacks foundation, and does not corroborate Plaintiff's contention that Bendotti actually submitted her name.

tus as a faculty member. Rather, she contends that the justification is pretextual because Raul Monreal, an administrator, was allowed to serve on the Committee in 1998–1999. In support, Plaintiff presents an undated, unsubstantiated document entitled "Paradise Valley Community College Campus Committees & Project Teams Faculty, Staff & Administrative Assignments 1998–1999." Exh. 41 to PSOF.[3] The document does not establish that Monreal served in a similar capacity to a faculty member, because he was not listed with faculty members, including Jan Downey, but rather was separately listed as an "Administrative./ Work Unit Representative." Thus, Plaintiff is left with no evidence of what role Monreal served on the Diversity Committee, and no evidence of whether or for what reason he was selected instead of Plaintiff. In short, there is no evidence of pretext in Plaintiff's failure to be selected for the Diversity Committee.

### E. Plaintiff's Failure to Promote Claim

### (1) Prima facie case and Defendant's race-neutral justification

■ Plaintiff's final disparate treatment claim is that she suffered discrimination in the decision to promote Dale, and not Plaintiff, to Dean of Student Services. Defendant essentially concedes that Plaintiff can establish a prima facie case on her failure to promote claim. Plaintiff was similarly situated to Dale, a white male, and both of them had the same title, Associate Dean of Student Services. They were the only two Associate Deans of Social Services, and the only two candidates that Cardenas, the sole decision-maker, seriously considered for promotion to Dean. Dale was treated more favorably than Plaintiff when he received the promotion, instead of Plaintiff.

As a race-neutral justification, Defendant contends that Plaintiff was not promoted because she had interpersonal relationship problems with staff other than himself. As previously noted, Cardenas was the sole decision-maker. When asked to provide the ultimate reason for not choosing Plaintiff as Dean, Cardenas testified: "My sense was that if she was having these problems managing a small unit, management issues related to staff, and so forth, that it would be difficult for her to assume a more significant position." Cardenas Depo. at 55. He further clarified that "staff problems" were "relationship problems, relating to staff." *Id.* Cardenas also testified that he had no further problems with Plaintiff's performance, *see id.*, though he later elaborated in his Declaration: "The person appointed to the Dean of Students position was going to have significant interaction with faculty, administration and other non-students. Therefore, I felt that the person appointed to that position needed to have a significant amount of diplomacy, problem solving ability and finesse in working with people." Cardenas Decl. ¶ 6. Cardenas also indicated that he "was impressed with [Dale's] ability to manage sensitive situations with diplomacy and political adroitness." Cardenas Decl. ¶ 8.

To support its race-neutral justification, Defendant provides evidence of Plaintiff's conflict issues with a variety of PVCC employees. For example, as early as November 4, 1994, Kranitz sent Cardenas a memo, and Plaintiff was provided a copy, strongly criticizing the effectiveness of Plaintiff's professional style. Exh. 6 to DSOF; Green Depo. at 384. Kranitz indicated that "the manner in which [Plaintiff] chooses to deal with conflict has created a very adversarial relationship that is based

---

**3.** In its Reply, Defendant discusses this document but does not contest whether it lacks

foundation or constitutes inadmissible hearsay, and therefore the Court will consider it.

on allegations and innuendos rather than establishing the facts." Exh. 6 to DSOF. Kranitz also indicated that Plaintiff's "method of conflict resolution demonstrates a lack of respect for [her] position." *Id.*

 Plaintiff was also the subject of a number of complaints about her managerial style from her own staff. For example, Cher Whittum, a member of Plaintiff's staff, testified that she had problems with Plaintiff's management style and brought these to the attention of Kranitz and Cardenas. Whittum Depo. at 32, 44, 47; Cardenas Depo. at 71. Whittum complained that Plaintiff was rude, negative, abusive, and difficult. Whittum Depo. at 33. On or about May 7, 1997, Whittum, at the direction of Cardenas, submitted a six page memorandum detailing her concerns with Plaintiff's management style. Exh. 20 to DSOF; Whittum Depo. at 47.[4]

### (2) Evidence of Pretext

 Given these justifications, the burden shifts to Plaintiff to show facts indicating that Defendant's explanation is a pretext. "Proof that defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory pur-

pose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citations omitted). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "[T]he plaintiff may come forward with circumstantial evidence that tends to show the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable. Such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of [race]." *Godwin*, 150 F.3d at 1222.

 Plaintiff does not present a genuine factual dispute that supports an inference of pretext. Because Cardenas was the sole decision-maker, Plaintiff must present some evidence that creates a credibility question regarding Cardenas's claim that he chose Dale over Plaintiff for reasons relating to staff personality conflicts. If Plaintiff can cast doubt on Cardenas's race-neutral justification, she can create an issue of fact regarding whether his reason was pretextual, thereby supporting an inference of discrimination. Almost all of Plaintiff's proffered evidence of pretext is misdirected, because it is not aimed at creating issues of fact regarding Carde-

---

4. Defendant also presents evidence of Plaintiff's conflicts with Cardenas in August and September 1998 concerning Spanish-speaking employees and permanent recruiters. This evidence will not be considered by the Court in evaluating Defendant's race-neutral justification because Cardenas never indicated that he relied upon his *own* conflicts with Plaintiff in making the decision not to promote her. Defendant also has not proven the truth of Cardenas's complaints, i.e., whether or not Plaintiff actually followed Cardenas's

directives. Further, the jury would be entitled to discredit the importance of those disputes between Cardenas and Plaintiff because they occurred so close in time to Cardenas's ultimate decision. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1218–9 (10th Cir.2002) ("A jury could reasonably infer that [plaintiff's] supervisors discriminated against [her] by inflating and exaggerating longstanding critiques of [her] performance as a means of exercising … animus towards [her].").

nas's credibility as the sole decision-maker. Though Plaintiff presents some evidence alleging poor treatment by Defendant, she provides no "specific and substantial" evidence of pretext in the promotion decision. *Godwin,* 150 F.3d at 1222.

### a. subjective decision-making

■ Initially, Plaintiff contends that the presence of subjective criteria in Cardenas's promotion decision indicates a likelihood of discrimination. Cardenas's decision-making process was highly subjective, because, as the EEOC noted, "there was no selection committee, the position was not announced, and there were no applications, resumes, tests, evaluations, or any other official school documents used to make an objective selection." Exh. 35 to PSOF. Further, Cardenas testified that, "I think my mind was made up that I was going to go in this direction [of picking Dale]." Cardenas Depo. at 46–7.

Although the internal investigation found no evidence of discrimination, it noted that "the hiring of employees through noncompetitive practices such as reassignments is associated with processes that invite illegal discrimination." Exh. 28 to PSOF. Further, the EEOC determination letter found the presence of subjective decision-making to be evidence of discrimination. Exh. 35 to PSOF.

The Ninth Circuit, however, holds that the presence of subjective criteria is not *per se* evidence of intentional discrimination. In *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir.1984), the Ninth Circuit stated:

We have explicitly rejected the idea that an employer's use of subjective employment criteria has a talismanic significance: 'Even assuming subjectivity was involved here, it has never been held that subjective evaluation by an employer is per se prohibited by Title VII, or

alone shifts to the defendant the burden of proving absence of intentional bias. . . .' *Title VII is the law's promise that employment decisions will not be based on non-permissible discriminatory criteria, not that subjective criteria will be eliminated.* [Plaintiff] cannot render sound business judgment illegal by labeling it subjective. Many criteria for higher level jobs are not easily articulable, and their conversion to writing does little to stop employers who desire to discriminate.

735 F.2d at 345 (quoting *Ward v. Westland Plastics, Inc.,* 651 F.2d 1266, 1270 (9th Cir.1980)) (emphasis added). *See also Jauregui v. City of Glendale,* 852 F.2d 1128, 1135 (9th Cir.1988) ("The use of subjective factors to evaluate applicants for hire or promotion is not illegal *per se.*").

On the other hand, *Casillas* clarified that a plaintiff may combine proof of reliance on subjective criteria with other evidence to show pretext. *Casillas* held that "[a]n employer's use of subjective criteria is to be considered by the trial court with the other facts and circumstances of the case." *Id.* at 345. Other Ninth Circuit case law establishes that the use of highly subjective criteria in employment decisions should be subject to close scrutiny. "Subjective job criteria present potential for serious abuse and should be viewed with much skepticism. Use of subjective job criteria ... provides a convenient pretext for discriminatory practices. Subjective criteria may easily be asserted as the reason for an adverse employment decision when, in fact, the reason was discriminatory." *Nanty v. Barrows Co.,* 660 F.2d 1327, 1334 (9th Cir.1981) (overruled on other grounds, *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756 (9th Cir.1996)). *See also Bergene v. Salt River Project Agr., Improvement & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001) ("Against the background of the other evidence of

pretext, the subjective nature of [the] criteria provides further circumstantial evidence that [defendant] denied [plaintiff] the promotion as a form of retaliation....”); *Jauregui*, 852 F.2d at 1135 (“[T]his circuit has cautioned ‘that subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized.’”) (quoting *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1481 (9th Cir.1987) (en banc)).

■ A remarkable similar case is *Stones v. Los Angeles Cmty. Coll. Dist.*, 796 F.2d 270 (9th Cir.1986), which was tried to the district court and appealed. In *Stones*, the plaintiff, a “highly accomplished black woman educator” who held the position of assistant dean, brought suit against her employer, a community college district, for failure to promote her to a dean position. *Id.* at 271. Plaintiff was neither called for an interview nor was she hired for four different dean openings. In its defense, the defendant noted that Plaintiff’s file contained a number of “tracers,” which were subjective assessments from past supervisors expressing the opinion that Plaintiff was condescending, rigid, and lacking in communicative and diplomatic skills. *Id.* at 273–4. The Court found that the defendant’s reliance on personal evaluations was a legitimate non-discriminatory reason for the failure to promote, and that the subjective nature of the evaluations did not invalidate their usefulness. *Id.* at 274. *See also Stones v. Los Angeles Cmty. Coll. Dist.*, 572 F.Supp. 1072, 1082–3, n. 12 (C.D.Cal.1983) (district court’s explanation of acceptable use of subjective evaluation criteria). In *Stones*, the Ninth Circuit’s standard of review was one of clear error following the bench trial. *Id.* at 272. The standard of review for a motion for summary judgment does not completely overlap that for a bench trial but there is a parallel. In both the plaintiff must show more than the presence of subjective evaluations to prevail on a discrimination claim.

Finally, Plaintiff has not pointed to any evidence showing that Defendant’s use of a subjective process was unusual or inconsistent with Defendant’s general promotion or reassignment policies. Plaintiff points to no requirement or established practice at any time of an objective, committee-based promotion or reassignment process at PVCC for those within executive-tiered employment. Indeed, Plaintiff points to a number of administrators who were upgraded to a different position without posting the new position. PSOF ¶¶ 217–220. In her Statement of Facts, Plaintiff attempts to prove that PVCC did have an objective hiring process. PSOF ¶¶ 180–1. Defendant has moved to strike this evidence, and the motion will be granted in part. The cited testimony refers only to a selection process involving a financial aid position at PVCC, and makes no reference to any set procedures employed by PVCC. Green Depo. at 66–69. Plaintiff has conceded that her personal knowledge concerning reassignment practices at community colleges in the District is limited. Green Depo. at 356–7. Finally, the attached forms have no context, foundation, or semblance of relevancy. In contrast, Defendant’s internal investigation found that “[p]er job group policy, employees may be reassigned in a position with a different title at the same or higher grade level.” Exh. 28 to PSOF. Plaintiff has insufficient admissible material evidence that Cardenas’s use of subjective decision-making regarding the Dean position was itself discriminatory or even unusual.

**b. lack of formal feedback or negative evaluations**

Plaintiff next contends that Defendant’s lack of formal feedback or negative evaluations concerning her alleged “relationship

problems" creates an inconsistency with Cardenas's proffered reason for lack of promotion.

 Defendant essentially concedes that Plaintiff was given no formal feedback. In Cardenas's deposition, he was asked if he was aware of disciplinary or corrective action concerning relationship "problems" and responded, "I'm not aware of any." Cardenas Depo. at 55. Cardenas further testified that he was not aware of any action taken by Kranitz to work with Plaintiff on her management style, and stated that he did not himself address Plaintiff's management style. *Id.* at 25. Cardenas also indicated that he "always thought" he and Plaintiff had a "good relationship," but that "there were times when there was some tension," but "that's part of running an organization." *Id.* at 32.

Further, the two performance evaluations which Defendant issued in 1994 and 1995 contained positive feedback. Exh. 17 to PSOF. The 1994 Performance Appraisal Summary Form, signed by Kranitz, indicates that Plaintiff "communicates well," "makes decisions well," "has a very good relationship with the administration," "has a good relationship with her peers," "has a good working relationship with the college community," "exercises good judgment in carrying out her job duties," "clearly demonstrates leadership abilities," and "is an integral part of the administrative team at PVCC." *Id.* It also indicates that "[t]he areas that report to Shirley are organized well and run effectively and efficiently." *Id.* In fact, there are no criticisms of Plaintiff's performance in the 1994 evaluation. *Id.,* Kranitz Depo. at 31–32. Plaintiff's October 1995 performance review, also signed by Kranitz, similarly lacks negative feedback. Exh. 18 to PSOF.

After close scrutiny, the Court concludes a genuine issue of material fact is not created merely because Plaintiff's performance reviews do not reflect the noted conflict her colleagues had with her management style. This conclusion is warranted primarily because Plaintiff expressly concedes, notwithstanding the evaluations, that she *had* personality and relationship conflicts with her supervisors which were the very reason she was not promoted. If Plaintiff contended that she *did not* have issues with other members of the staff, the performance reviews would support her position, and demonstrate an inconsistency in Defendant's explanation. *See Godwin,* 150 F.3d at 1222 ("[T]he plaintiff may come forward with circumstantial evidence that tends to show the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable."). Concomitantly, if Plaintiff was terminated, the performance reviews would be inconsistent with an explanation that her performance was below an objective standard. Here, there is no inconsistency, for two reasons. First, Defendant does not claim that Plaintiff is *unqualified* for the position, merely that Dale was *better* suited for the position because he had fewer and in fact no conflicts with personnel, and had a better relationship with staff and administrators. Second, again Plaintiff simply does not dispute that she has an established record of conflict with other members of staff, nor does she offer evidence that Dale had similar conflicts.[5]

Retrospectively, it might have been advisable for Defendant to have given performance evaluations critiquing Plaintiff's management style or to have made a formal record of grievances (just as it may

**5.** Further, Plaintiff provides no evidence that she formally contested any of the conflicts with her supervisors expressed in written documentation, including Kranitz's 1994 memo, even though Plaintiff was aware of such criticisms of her professional style.

have been advisable to have posted the Dean position and conducted interviews), but the Court does not sit to establish policies for employers or to determine the optimum human resource policies for this Defendant. Rather, the Court must determine whether there is any disputed fact which could raise an inference of discrimination. *See Casillas,* 735 F.2d at 344 ("Title VII is not a civil code of employment criteria and it was not intended to diminish traditional management prerogatives. The issue is whether the employer's decision was discriminatory. . . .") (quotations omitted); *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996) (*per curiam* ) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is race."). Plaintiff's history of performance evaluations and lack of feedback do not create an issue of fact regarding whether Defendant's stated race-neutral reason is pretextual.

 The Court notes that the question presented in this case is a close one, but the Court is persuaded that its focus is on the motive of the decision-maker to search for discriminatory intent, rather than to evaluate the wisdom of Defendant's internal management policies. This conclusion is supported by case law both within the Ninth Circuit and across other circuits. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the that decision." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir.2000) (citations omitted). *See also Simms v. Oklahoma,* 165 F.3d 1321, 1330 (10th Cir.1999) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citations omitted). As the Second Circuit recently clarified, "[w]hile the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility." *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1048 (11th Cir.2000)). Because the focus is on the employer's credibility, "[w]here an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn." *Byrnie,* 243 F.3d at 105 (quotations and citations omitted).

 Finally, the Ninth Circuit has repeatedly cautioned that the use of subjective criteria is not necessarily more likely to indicate discriminatory intent than the use of objective criteria, which may still be a guise for discrimination. "[P]roving business necessity is no more onerous in a case involving subjective practices than one involving objective practices, because in either case the employer is the person with knowledge of what his practices are and why he uses the methods and criteria he does . . . ." *Jauregui,* 852 F.2d at 1135, n. 11 (quoting *Atonio,* 810 F.2d at 1486). "Subjective practices may well be a covert means to effectuate intentional discrimination . . . but they can also be engendered by a totally benign purpose, or carried on as a matter of routine adherence to past practices whose original purposes are undiscoverable. Subjective practices are as likely to be neutral in intent as objective ones." *Atonio,* 810 F.2d at 1484. *See also Nanty,* 660 F.2d at 1334 ("In a case involving higher echelon employment, the skills for which are necessarily measured in more subjective terms, the same potential for [discriminatory] abuse exists, but the use of subjec-

tive criteria is inherently less suspect.").[6] Absent evidence that Cardenas's reliance on Plaintiff's record of personal conflicts was a pretext for discrimination, the Court will not second-guess the process by which Cardenas arrived at his conclusions.

### c. EEOC cause determination letter

■ The EEOC issued a letter finding reasonable cause to believe that discrimination had occurred. Exh. 25 to DSOF. However, under Ninth Circuit precedent, an EEOC cause letter does not alone create a genuine issue of material fact. The Court must further scrutinize the cause letter to determine its usefulness in evaluating the factual circumstances. As the Ninth Circuit recently explained, "Nor does the EEOC reasonable cause determination create a genuine issue of material fact. An EEOC letter is a highly probative evaluation of an individual's discrimination complaint.... Such letters, however, are not homogenous products; they vary greatly in quality and factual detail." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir.2000) (quotations and citations omitted). "If the EEOC's suing is insufficient to create a genuine issue of material fact, then, a priori, a conclusory EEOC reasonable cause letter, at least by itself, does not create an issue of material fact." *Id.* at 1284. *Accord Ogunleye v.*

*Arizona,* 66 F.Supp.2d 1104, 1108 n. 5 (D.Ariz.1999) ("The significance of an EEOC determination necessarily rests upon the thoroughness of the EEOC investigation.").

■ In this case, the EEOC letter does not establish any evidence of pretext, because the investigator, Jose Robinson ("Robinson"), never interviewed the sole decision-maker, Cardenas, nor evaluated Defendant's proffered reason for the promotion decision. Robinson testified that Kranitz informed him that Cardenas made the final decision to hire Dale, but nevertheless, Robinson only interviewed Kranitz and Plaintiff. Robinson Depo. at 19, 22. Because Robinson never interviewed Cardenas, the letter does not evaluate Cardenas's credibility, nor consider Cardenas's actual stated reason for Plaintiff's non-promotion. In fact, both the letter and Robinson's investigative memorandum, on which the letter is based, completely overlook Cardenas's specific explanation and indicate erroneously that Defendant's race-neutral explanation was only that Plaintiff "has enjoyed promotional opportunities, and accompanying salary increases." Robinson Depo. at 38–40; Exh. 24 to DSOF. These mistakes undercut the reliability of the EEOC letter, because the letter is not based on reliable

---

**6.** Scholars have noted that the existing Title VII legal framework does not mandate close scrutiny of subjective internal business decision-making procedures, even while suggesting that the current legal framework be altered to more uniquely evaluate such practices. *See, e.g.,* Tristin K. Green, *Discrimination in Workplace Dynamics; Toward a Structural Account of Disparate Treatment Theory,* 38 Harv. C.R.-C.L. L.Rev. 91 (2003). However, as Professor Green, a proponent of expanded anti-discrimination laws, notes:

Nor is there reason to suspect (without evidence to suggest otherwise) that modern firms are turning to subjectivity in decision-making to mask an underlying intent to discriminate. Rather, as we have seen,

many employers are turning to subjectivity in decisionmaking as part of a larger movement away from a hierarchical, job-centered workplace and toward a decentralized, flexible, individualized one.... [I]t may make political and social sense to encourage the trend toward an involvement-centered workplace that value individual skills and achievement over prescribed hierarchical status. As discussed earlier, this movement is highly consistent with American democratic values, and it holds great promise for the antidiscrimination project by emphasizing individual strengths over group status or hierarchy.

*Id.* at 144.

evidence regarding the decision-maker's intent.

Rather than investigating Plaintiff's alleged personality conflicts, the EEOC letter relies heavily on the use of subjective criteria in the hiring process to show discrimination, even though the use of subjective criteria alone is not *per se* evidence of discrimination under Ninth Circuit precedent. The memorandum does rely on one finding from the internal investigation that "[t]he rationale offered for the reassignment... related to *subjective* decisions on how [Dale] is perceived on issues regarding leadership and congeniality." Exh. 24 to DSOF (emphasis in original). The letter also briefly mentions the subjective assessment of Dale's personality skills, though, again, there is no evidence that Robinson investigated this aspect further. In fact, Robinson's notes of his interview with Kranitz do not indicate that he asked her any questions about staff and managerial relationship issues. Exh. 22 to DSOF. As previously noted, the mere fact that such assessments of personality skills were subjective is insufficient to provide evidence of discrimination. In sum, the EEOC letter supplies no independent evidence of pretext, and is insufficient to create a genuine issue of material fact.

### d. "visibility" and committee assignments

Plaintiff argues that her removal from various committees in favor of Dale constitutes evidence of pretext. As discussed in Part II.D, Plaintiff's activity on committees arguably influenced her "visibility" and thus her potential for promotion. *See*

Kranitz Depo. at 36, *Bryson,* 96 F.3d at 916–7. Plaintiff's claims about being removed from committee assignments rely entirely on Plaintiff's own testimony, and Defendant disputes whether or not Plaintiff was actually "removed." Even viewing this evidence in the most favorable light to Plaintiff, the evidence does not raise an inference of discrimination.

 First, Plaintiff only claims that *Kranitz,* not Cardenas, removed her from committee assignments. *See* PSOF ¶ 196, 197; Green Depo. at 297, 421–2. Kranitz did not make the promotion decision, and therefore her actions shed no light on whether *Cardenas* harbored a discriminatory intent when he selected Dale. Under Ninth Circuit precedent, this evidence might create a genuine issue of fact if she could show that Kranitz was actually involved in the decision, but she provides no such evidence. *See Bergene,* 272 F.3d at 1141 ("Even if a manager was not the ultimate decisionmaker, that manager's [discriminatory] motive may be imputed to the company if the manager was involved in the hiring decision.") Second, significantly, Cardenas has not indicated that he relied on Plaintiff's visibility or committee assignments to make his decision, so there is no independent evidence of a link between the committee assignments and Cardenas's ultimate decision.[7] Finally, Plaintiff's perceived snubs in favor of Dale are not relevant because she has not shown that they are related to race discrimination. *See Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 271 (9th Cir. 1996) (no evidence of pretext where super-

---

**7.** Plaintiff did testify that after Dale's promotion was announced, she confronted Kranitz about why she was not promoted, and Kranitz again told her that "she wasn't visible enough." Green Depo. at 372–3. However, Kranitz also specifically indicated that Cardenas made the promotion decision. *Id.* Actions taken and statements made by a non-decisionmaker are not relevant to the determination of the intent of the actual decisionmaker. *See, e.g., Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 925 (7th Cir.1988) (statements by non-decisionmakers not generally probative of whether explanation for decision was pretextual).

visor favored another employee and "[n]othing indicates that ... favoritism... stemmed from his sex rather than his competence and performance"). Therefore, Plaintiff's alleged removal from committees by Kranitz does not provide any evidence of pretext.

### e. office location and signage

■ Plaintiff argues that her office location, though not cognizable as an adverse employment action, constitutes evidence admissible to show that she was treated differently from other Associate Deans. Plaintiff presents evidence that all the non-Black administrators have offices in Building A, which has more prominent signage. In response, Defendant contends that Plaintiff still occupies Building B because she oversees the Admissions and Records Department, located in Building B. In response, Plaintiff provides only conclusory assertions that Dale supervises staff members located in other buildings, and provides no evidence of the extent of such supervision nor whether those duties are as comparable to her work in Admissions and Records. PSOF ¶ 248; Decl. of Green at ¶ 23, Exh. 2 to PSOF. This evidence is certainly not specific and substantial.

Moreover, even assuming that Plaintiff could prove that she was treated differently than other Associate Deans, this evidence would not establish pretext for the same reasons that the committee assignments do not establish pretext. First, she provides no record evidence that Cardenas had any authority or responsibility regarding her office location. Second, Cardenas gave no indication that her office location had any bearing on his promotion decision. Because her office location does not create an issue of credibility regarding Carde-

nas's promotion explanation, the evidence does not suggest discriminatory pretext.[8]

### f. conflict over Spanish-speaking staff

■ Plaintiff contends that Cardenas's conflict with her over whether she had Spanish-speaking staff in August 1999 establishes evidence of pretext. In that dispute, Cardenas criticized Plaintiff for not employing full-time Spanish-speaking staff, while Plaintiff contended that she did have such staff, though not of Hispanic origin. However, there is no evidence that Cardenas singled out Plaintiff for adverse treatment. It is undisputed that he spoke to both her and Larry Fields on August 6, 1998, the day of the confrontation. He also sent an email to Kranitz that day, emphasizing the need for Spanish-speaking staff and adding, "I hope I will not have to revisit this topic again with you or your staff." Exh. 21 to PSOF. Plaintiff sent Cardenas an email explaining her position on Spanish-speaking staff, *see* Exh. 22 to PSOF, but even this characterized the disagreement as a misunderstanding of Plaintiff's efforts to hire Spanish-speaking staff. Plaintiff, in her deposition, characterized the conflict as a misunderstanding, saying, "He was upset. He misinterpreted what he saw, and he was upset because of it." Green Depo. at 406. Cardenas's response indicated, in part, "[Fields] understood my concern.... You chose to challenge me. It's really a matter of attitude Shirley." Exh. 23 to PSOF.

Plaintiff has no evidence showing that Cardenas singled out Plaintiff for abusive treatment, and this evidence does not create an issue of credibility regarding Cardenas's intent in denying Plaintiff the promotion. The extent of Plaintiff's argument

---

8. The EEOC letter also indicated that office location was evidence of discrimination, though, as discussed above, there is no indica-

tion that the EEOC investigated why Plaintiff was officed in Building B, nor whether Cardenas was involved in that decision.

is that "[o]ne *could surmise* that Cardenas created these disputes to justify his decision to promote Dale." Response at 6 (emphasis added). However, Cardenas never indicated that he made his promotion decision on the basis of his *own* conflicts with Plaintiff. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. Instead, the non-moving party must go beyond the pleadings and by its own evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir.2001) (quoting Fed.R.Civ.P. 56(e)). There is no evidence of discriminatory treatment, and Plaintiff cannot rely on speculation about Cardenas's motives to create a question of credibility.

### g. conflict over permanent recruiter

▇ Plaintiff contends that the conflict between her and Cardenas in early September in which Cardenas criticized her for not hiring a full-time recruiter was also a pretext for her lack of promotion. Plaintiff's evidence is insufficient, for the same reasons discussed regarding her evidence concerning Spanish-speaking staff. Cardenas never testified that the recruiting dispute was a reason for the decision to promote Dale, and Plaintiff has no admissible evidence that this dispute was designed to inappropriately single her out for criticism.[9]

Plaintiff attempts to create an issue of pretext by offering evidence that Cardenas treated other employees differently in regards to his policy on recruiters. Specifically, she claims that Cardenas allowed a temporary recruiter, Christine Rosario ("Rosario") to be hired in a department overseen by Dale, even though Plaintiff was not allowed to hire a temporary recruiter. Upon further review, however, Plaintiff presents no admissible evidence of her claims. Plaintiff claims that Rosario told her that she had been hired by Raul Monreal, who reported to Dale, to do recruiting in high schools. Green Depo. at 202. Defendant has moved to strike this evidence, and it will be stricken. This statement by Rosario is clearly hearsay, because it is an out-of-court-statement offered to prove that Rosario did in fact perform recruiting. Plaintiff also does not have personal knowledge of this fact because she did not observe Rosario doing any recruiting, and did not speak about her to Monreal, Dale, Kranitz, or Cardenas. *Id.* at 203. In fact, she testified that she has no firsthand knowledge of whether Cardenas knew of Rosario's hiring. *Id.* at 204. Cardenas, in fact, testified that he did not remember hearing of Christine Rosario, and could not recall if there was a period of time in which the recruitment position went unfilled. Cardenas Depo. at 67. Plaintiff thus cannot prove either that Rosario actually was hired to do recruiting, contrary to Cardenas's policy, or that Cardenas knew that Rosario had been hired. Therefore, Plaintiff has no admissible evidence of pretext.

### h. Plaintiff's qualifications

▇ Finally, Plaintiff offers her own assertion that she possessed superior qualifications than Dale. Both she and Dale had the same title and similar educational credentials. Plaintiff's primary superior qualification was her seniority, and she presents no evidence that Defendant regu-

---

9. Plaintiff makes a brief, unsubstantiated claim that Cardenas's policy decision to hire full-time recruiting employees may have been related to the fact that Beverly Hunter, the temporary employee displaced by Cardenas's policy, was African–American. There is certainly no evidence, direct or indirect, that Cardenas's decision was based on that factor, nor that Cardenas was even aware of Beverly Hunter's race.

larly used seniority as a criterion for promotion. Without further evidence, her own personal judgments of her qualifications do not create a fact issue. *See Bradley*, 104 F.3d at 267 ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").

### F. Failure to upgrade claim

■ As a final matter, Plaintiff claims that she suffered discrimination because she failed to receive an administrative upgrade after she requested an upgrade in September 1998. This claim does not state a prima facie case independent of her failure to promote claim. To the extent that Plaintiff claims that she should have been promoted to Dean, her claim is simply redundant of her failure to promote claim. To the extent that Plaintiff claims that she should have received an upgrade *even though* she was not chosen for Dean, she presents no evidence that she was entitled to such an upgrade, or that similarly situated non-black individuals received such an upgrade when she did not. Plaintiff does not specifically attempt to separate her claims in her Response [Doc. # 83]. Nevertheless, in her Deposition, she testified that she applied for an upgrade in September 1998 based on both Dale's promotion and the upgrade of another Associate Dean, Mary Lou Mosley ("Mosley"), who is Caucasian, and who was promoted from Associate Dean of Instruction to Senior Associate Dean of Instruction. Green Depo. at 423; Kranitz Decl. ¶ 14. Plaintiff testified: "There are three associate deans; two are white, one is black. The two white associate deans are

promoted, the black associate dean was not." *Id.* at 424.[10]

Plaintiff establishes no prima facie case on the upgrade issue, however, because Mosley was not similarly situated. Defendant's evidence indicates that Stahl, the Dean of Instruction, requested an upgrade for Mosley because she had taken on significantly new responsibilities. Kranitz Decl. ¶¶ 15, 16. However, Plaintiff did not take on any significant job responsibilities after September 1998. Cardenas Decl. ¶ 12. In her Response, Plaintiff does not controvert any of the evidence about Mosley. In fact, Plaintiff testified that she had no personal knowledge of Mosley's daily activities. Green Depo. at 120. Plaintiff has not provided any evidence comparing them, other than that they both held the title of Associate Dean in different departments. Therefore, there are no genuine issues of material fact whether Plaintiff was similarly situated to Mosley, and Plaintiff's failure to upgrade claim does not exist independent from her failure to promote claim.

### III. MOTIONS TO STRIKE

#### A. Defendant's Motion to Strike

(1) Declaration of Green: Defendant's objections to ¶ 10, concerning the Diversity Committee assignment, were addressed in Part. II.D, and ¶ 10 will be stricken. Paragraph 16 will also be stricken, because Plaintiff conceded that she has no personal knowledge of whether she was the "only" qualified person to be removed from a committee. Green Depo. at 316–7. Regarding ¶ 23, Plaintiff has testified that she has no personal knowledge of what Mosley

---

10. Plaintiff also asserts, more broadly, that, "Other than me (and Fred Stahl who was already dean), every dean and associate dean at PVCC during Cardenas's tenure was promoted." Green Decl. ¶ 26. However, Plaintiff also concedes that the *only* position she

has been interested in obtaining at PVCC since 1993 is the Dean position given to Dale in 1998. Green Depo. at 330. Therefore, Plaintiff's discrimination claim must be limited to the one position, Dean of Student Services, to which she aspired.

did "day in and day out," so her statements about Mosley's job lack foundation and must be stricken. Green Depo. at 120. With regard to Dale, Plaintiff claims to have personal knowledge of Dale's interactions with students and staff members located in other buildings. Defendant points to Plaintiff's testimony that she did not have knowledge of whether Dale interacted with a larger group of employees than she did, but this testimony does not specifically contradict her Declaration. Green Depo. at 347. Therefore, the statements about Dale in ¶ 23 will not be stricken.

(2) PSOF ¶ 75 will be stricken. The newspaper article lacks foundation and is inadmissible hearsay as to the truth of all its contents.

(3) PSOF ¶ 132: The subject of this paragraph concerns the dispute between Cardenas and Plaintiff over a full-time recruiter. Plaintiff claims that Christine Rosario told her that she had been hired by Raul Monreal, who reported to Dale, to do recruiting in high schools. Green Depo. at 202. This statement by Rosario is clearly hearsay, for the reasons explained above in Part II(E)(2)(g). Plaintiff's testimony about what Cardenas and Rosario told her, and Cardenas's beliefs, are inadmissible because offered to prove the truth of the matter asserted. Conversely, the statement that Cardenas told her not to have a temporary employee handle recruiting is admissible to the extent that it shows that Plaintiff understood Cardenas to instruct her as such.

(4) PSOF ¶¶ 180 and 181 concern whether PVCC or the District had a policy to conduct an objective selection process for upgrades. These paragraphs will be stricken for the reasons explained in Part II.E, because the evidence in the record does not support the statements.

**B. Plaintiff's Motion to Strike DSOF Regarding Promotion Issues**

(1) Plaintiff objects to a number of statements not supported by the record. Defendant has submitted a Notice of Errata [Doc. # 91] correcting the typographical errors. Thus, ¶¶ 11, 33, 35, 38, and 44 are now accurate and will not be stricken. In addition, ¶ 39 quotes directly from the record cited, and will not be stricken.

(2) DSOF ¶ 18: The cited testimony supports the statement that Cardenas and Kranitz discussed the grievances of Cher Whittum. Whittum's testimony supports the truth of the matter that she did in fact make complaints. Whittum Depo. at 32, 44.

(3) DSOF ¶¶ 28, 29, 30: These statements, concerning Plaintiff's conflicts with Kranitz, accurately reflect the record and are supported by the underlying evidence, for the most part. Strictly speaking, the testimony underlying ¶ 29 does not refer to a "supervisory" relationship, and the citation underlying ¶ 30 refers to the relationship between Plaintiff and Kranitz, not "her superiors" in general. Those words will be stricken.

(4) PSOF ¶ 32 summarizes Kranitz's criticism of Plaintiff's management style. While accurate, it does not use Kranitz's own language. However, the Court has disregarded the summary and relied upon Kranitz's actual testimony. Similarly, PSOF ¶ 97 summarizes Cardenas's reasons for not giving Plaintiff an upgrade. The cited testimony is unclear, but again the Court has relied on the actual testimony rather than the formulation in ¶ 97.

(5) PSOF ¶ 66: Plaintiff argues that Defendant's characterization of the EEOC investigation is "argumentative." This paragraph is generally supported by the record, though the description of Robinson

"simply" using comparative evidence is debatable and has not been embraced by the Court.

(6) PSOF ¶ 98: Plaintiff has indeed testified that she was only interested in one promotional opportunity at PVCC, Dean of Students. *See* Green Depo. at 330. Therefore this paragraph is supported by the record.

### C. Plaintiff's Motion to Strike DSOF Regarding Non–Promotion Issues

(1) Plaintiff contends that a number of paragraphs are not supported by the record. Defendant has submitted a Notice of Errata [Doc. # 89], and thus ¶ 8 and the paragraphs discussed below are now accurately supported.

(2) DSOF ¶ 3, which describes Kranitz's employment history, is supported by the record and the Kranitz Declaration, Exh. 5 to DSOF, and will not be stricken, except for the (undisputed) description of her responsibility for Student Services after 1998, which is not supported by these citations and will be stricken.

(3) DSOF ¶¶ 53, 55: These statements concern the extent of Robinson's investigation of Plaintiff's complaint. Robinson was not specifically asked whether he interviewed Kranitz on the subject of Plaintiff's conflicts, nor whether he generally "considered" any other evidence of Plaintiff's conflicts with Cardenas. Robinson's testimony was, "[i]f it's not on the recorded interview, then I didn't ask her." Robinson Depo. at 45. His testimony is unclear whether he is referring to a recording of the interview, or a physical record provided as evidence. Defendant's interpretation of his testimony in this regard is speculative, and the Court has relied on portions of Robinson's actual testimony only to the extent explained in Part II(E)(2)(c).

(4) DSOF ¶ 58: Plaintiff argues this paragraph, concerning evidence Robinson

testified he relied upon to make a recommendation for a cause finding, is "argumentative," but it is supported by the record and the Cardenas Declaration ¶ 14, and will not be stricken.

(5) DSOF ¶ 59 is speculative, because Robinson testified that he *might* have relied on evidence in the file besides that listed in his Investigative Memorandum, Exh. 10 to DSOF, in making his determination recommendation. Robinson Depo. at 39–40. He did testify that he could not recall relying upon any specific piece of information not listed in the Investigative Memorandum. Robinson Depo. at 40–41. The Court has relied on Robinson's actual testimony, rather than Defendant's interpretation of it.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment Regarding Plaintiff's Non–Advancement Claims [Doc. # 73] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment Regarding Promotion and Job Upgrade Issues [Doc. # 75] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's Statement of Facts in Support of Motion for Summary Judgment Re Non–Advancement [Doc. # 86] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's Statement of Facts in Support of Motion for Summary Judgment Re Promotion and Job Upgrade [Doc. # 84] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's Statement of Facts in Support of Response to Defendant's Motion for Summary Judgment [Doc. # 104] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for the Defendant, terminating this case.